**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCOTT GILMORE, JAMES WEEKS, PAUL TAYLOR, SHERRY HANNA, AMANDA BOYETTE, JULIO EZCURRA, ANTHONY JEWELL, AND KRISTY WILLIAMS | Case No.: 20-cv-01085 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| MONSANTO COMPANY, | |
| Defendant. | |

**SECOND AMENDED COMPLAINT**

Plaintiffs SCOTT GILMORE, JAMES WEEKS, PAUL TAYLOR, SHERRY HANNA, AMANDA BOYETTE, JULIO EZCURRA, ANTHONY JEWELL, AND KRISTY WILLIAMS ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through the undersigned counsel, hereby bring this Second Amended Class Action Complaint against Defendant MONSANTO COMPANY ("Defendant" or "Monsanto") and alleges as follows:

**INTRODUCTION**

1.     This case arises from Monsanto's wrongful conduct in connection with its manufacture, promotion, marketing, advertising, distribution, labeling, and sale of the Lawn and Garden herbicide Roundup®, which contains the active ingredient glyphosate and other chemicals, including the surfactant polyethoxylated tallow amine ("POEA").

2.     At all relevant times, Monsanto was and is aware Roundup® has the potential to cause users to develop cancer. Monsanto is aware glyphosate is a Class 2A herbicide, meaning the World Health Organization's ("WHO") International Agency for Research on Cancer ("IARC") has determined it is probably carcinogenic to humans.

3.     Monsanto is also aware California has classified glyphosate as a chemical known to cause cancer, such as Non-Hodgkin's lymphoma ("NHL").

4.     Monsanto has also known Roundup® and other glyphosate-based herbicides have been banned by many countries, regions, and municipalities throughout the United States and the world because it is dangerous to human health.

5.     Monsanto is the defendant in tens of thousands personal injury cases brought by individuals who allege exposure to Roundup® caused their cancer.[1] Three juries found Roundup® likely caused some of those plaintiffs to develop NHL, and awarded nearly $100 million in compensatory damages and over $2 billion in punitive damages collectively.[2]

6.     Despite Monsanto's knowledge of Roundup®'s potential carcinogenicity, Monsanto has failed to convey this information to consumers in its promotion, marketing, advertising, distribution, labeling, and sale of Roundup®.

7.     Although the Environmental Protection Agency ("EPA") has stated glyphosate is not likely to be carcinogenic to humans, Defendant, at the very least, should inform consumers there has been an ongoing scientific dispute over its potential carcinogenicity.

---

[1] Most of these cases have been consolidated in a multi-district litigation ("MDL") before Judge Vince Chhabria in the Northern District of California and many have recently settled for billions of dollars.

[2] As discussed herein, these awards were later reduced by the trial court. One verdict was recently upheld, and the other two are presently on appeal.

8.      Monsanto's concealment, suppression, or omission of material facts (*i.e.* the possibility that exposure to Roundup may cause cancer and the ongoing scientific debate about same), with intent that others rely upon such concealment, suppression or omission in connection with its promotion, marketing, advertising, distribution, labeling, and sale of Roundup®, constitutes a violation of Delaware's Consumer Fraud Act ("DCFA"), <u>Del. Code Ann.</u> tit. 6, § 2513 and a breach of warranty.

9.      Defendant's violation of the DCFA and breach of warranty has caused Plaintiffs and members of the Class to suffer an ascertainable loss.

## <u>JURISDICTION AND VENUE</u>

10.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). Defendant is either incorporated and/or has its principal place of business outside the state in which Plaintiffs and members of the proposed Class reside. Furthermore, there are more than 100 Class Members and the amount-in-controversy exceeds $5,000,000 exclusive of interest and costs.

11.     This Court has personal jurisdiction over Defendant because Defendant is a citizen of Delaware and transacts business in the state. Defendant knows that its Roundup products are and were sold throughout Delaware, and caused Roundup to be sold across the United States, including Delaware. In addition, Defendant maintains sufficient contacts with the Delaware such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because Defendant is a resident of this judicial district and the material omissions giving rise to Plaintiff's claim arose, in part, in Delaware.

## PARTIES

13.     Plaintiff SCOTT GILMORE ("Plaintiff Gilmore") is an individual who resides in the State of Washington and is a member of the Class alleged herein.

14.     Plaintiff JAMES WEEKS ("Plaintiff Weeks") is an individual who resides in Oxnard, California and is a member of the Class alleged herein.

15.     Plaintiff PAUL TAYLOR ("Plaintiff Taylor") is an individual who resides in Redding, California and is a member of the Class alleged herein.

16.     Plaintiff SHERRY HANNA ("Plaintiff Hanna") is an individual who resides in Joshua Tree, California and is a member of the Class alleged herein.

17.     Plaintiff KRISTY WILLIAMS ("Plaintiff Williams") is an individual who resides in Lake Elsinore, California and is a member of the Class alleged herein.

18.     Plaintiff AMANDA BOYETTE ("Plaintiff Boyette") is an individual who resides in Texarkana, Arkansas and is a member of the Class alleged herein.

19.     Plaintiff JULIO EZCURRA ("Plaintiff Ezcurra") is an individual who resides in Palm Beach, Florida and is a member of the Class alleged herein.

20.     Plaintiff ANTHONY JEWELL ("Plaintiff Jewell") is an individual who resides in Texarkana, Arkansas and is a member of the Class alleged herein.

21.     Defendant MONSANTO is a Delaware corporation, Delaware Department of State File No. 3174788, with a principal place of business in St. Louis, Missouri. Defendant is engaged

in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the Roundup® products at issue in this case.

22.    Defendant is a subsidiary of nonparty Bayer AG, a German corporation ("Bayer"). Bayer acquired Monsanto in June 2018 and the merger agreement is governed by Delaware law.

23.    The terms "Roundup" and the "Product" refer to the following: Roundup® Ready-to-Use Weed & Grass Killer (all sizes, applicators, and varieties), Roundup® Ready-to-Use Weed & Grass Killer Plus (all sizes, applicators, and varieties), Roundup® Weed & Grass Killer Concentrate Plus (all sizes and varieties), Roundup® Weed & Grass Killer Super Concentrate (all sizes and varieties), Roundup® Ready-to-Use Poison Ivy Plus Tough Brush Killer (all sizes and varieties), Roundup® Ready-to-Use Wild Blackberry Plus Vine and Brush Killer (all sizes and varieties), Roundup® Concentrate Poison Ivy Plus Tough Brush Killer (all sizes and varieties), Roundup® Concentrate Wild Blackberry Plus Vine and Brush Killer (all sizes and varieties), Roundup® Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer (all sizes and varieties), Roundup® Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer (all sizes and varieties), Roundup® Ready-to-Use Max Control 365 (all sizes and varieties), Roundup® Concentrate Max Control 365 (all sizes and varieties), Roundup® Weed & Grass Killer Sure Shot Foam (all sizes and varieties), Roundup® Precision Gel Weed & Grass Killer (all sizes and varieties), Roundup® Pro Concentrate (2.5 Gal.), HDX® Weed & Grass Killer Ready-to-Use (all sizes and varieties), HDX® Weed & Grass Killer Concentrate (all sizes and varieties), Ace® Ready-to-Use Weed & Grass Killer (all sizes and varieties), and Ace® Weed & Grass Killer Concentrate (all sizes and varieties).

24.   Defendant has an agreement with its distributor of Roundup, nonparty The Scotts Company, LLC ("Scotts"). Under that agreement, Scotts is responsible for in-store merchandising, store set-up, and other services related to the in-store promotion of Roundup, in a manner consistent with Defendant's Annual Business Plan. The distribution agreement is governed by Delaware law.

25.   Defendant has made and continues to make representations regarding Roundup's potential health risks through various means of disclosure—for example, representations on its website, in-store advertising, its labeling of Roundup, and through its distribution relationship with Scotts. These means of disclosure originate, in part, in the State of Delaware.

26.   During all relevant times, Defendant transacted and conducted business throughout the United States and is responsible for the representations it makes, with respect to Roundup's potential health risks, throughout the country.

27.   Defendant does business in Delaware by consistently selecting its law and forums with respect to Roundup.

## **FACTUAL ALLEGATIONS**

A.      **Monsanto's Manufacturing, Promotion, Marketing, Advertising, Distribution, Labeling, and Sale of Roundup.**

28.   Monsanto was the first company to recognize potential in the chemical glyphosate, a nonselective herbicide that inhibits plant growth through interference with the production of essential aromatic amino acids.

29.   Monsanto discovered glyphosate to be an herbicide in 1970 and brought it into the market as Roundup in 1974.

30.   All of the Roundup products at issue in this case contain the active ingredient glyphosate, and other components, such as the surfactant POEA,[3] which helps glyphosate penetrate plant cells.

31.   Roundup is marketed for home and personal use to kill weeds, including weeds in home lawns and gardens. Roundup is sold at retail locations throughout the United States.

32.   Monsanto has and continues to promote, market, advertise, and label Roundup as a safe general-purpose herbicide for consumer use. Monsanto has admitted in other legal proceedings that Roundup products are valued by consumers because of their efficacy and safety.

33.   Monsanto's promotion, marketing, advertising, and labeling of Roundup leads reasonable consumers into believing Roundup is safe for its intended use.

34.   Monsanto, for example, designs the labeling for Roundup. Exemplar photographs of Roundup's front and back labels for the Roundup Ready-to-Use Weed and Grass Killer III are attached hereto as **"Exhibit A."**

35.   Roundup's labeling provides certain warnings, such as, "Keep Out of Reach of Children" and "Caution." But the only hazard identified is that it may cause "moderate eye irritation." *See id*.

36.   Roundup's warning gives the false impression eye irritation is the only risk posed by Roundup, when in fact, Roundup has the potential to cause cancer, as discussed more fully herein.

---

[3] Monsanto considers POEA to be inert because it does not directly kill plants, it merely enhances glyphosate's ability to do so

**B.        The IARC Classification of Glyphosate.**

37.    The IARC is an intergovernmental cancer agency within the WHO which, in 2015, was tasked with conducting and coordinating research into the causes of cancer as it pertained to glyphosate.

38.    In March 2015, an IARC "Working Group" of 17 experts from 11 countries convened to evaluate several insecticides and herbicides, including diazinon, tetrachlorvinphos, malathion, parathion, and glyphosate. The evaluation was based on a cumulative review of all publicly available and pertinent scientific studies. Some of the studies pertained to people exposed to glyphosate through their jobs, such as farmers. Others were experimental studies on cancer and cancer-related effects in experimental systems. The IARC Working Group's full monograph was published on July 29, 2015.

39.    In its monograph, the IARC Working Group classified glyphosate as a <u>Class 2A herbicide</u>, which means it is <u>probably carcinogenic to humans</u>. It concluded NHL was most associated with glyphosate exposure.

40.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

41.    The IARC's conclusions were consistent with scientific developments that had occurred in prior decades.

**B.        Early Studies and Developments Pertaining to Glyphosate and Roundup's Carcinogenicity and Genotoxicity.**

42.    As early as the 1980's, Monsanto should have been aware of glyphosate's carcinogenic and genotoxic properties.

43.    On March 4, 1985, a group of the EPA's Toxicology Branch published a "consensus review" based on a mouse study conducted by Monsanto in 1983. The review "classified Glyphosate as a Category C oncogen," meaning it is a possible human carcinogen.

44.    However in June 1991, EPA published a memorandum entitled, "Second Peer Review of Glyphosate," which changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions, and the Memorandum itself "emphasized however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

45.    In 1996, the New York Attorney General sued Monsanto for false and misleading advertising by touting its glyphosate-based Roundup products as, e.g.,  "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

46.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General, in which Monsanto agreed to alter the advertising, removing from advertisements that represent, directly or by implication, that the weed killers were biodegradable and environmentally friendly. Monsanto also agreed to pay $50,000 toward New York's costs of pursuing the case. At the time, New York was the only state to object to the advertising claims.

47.    In 1997, Chris Clements, *et al.* published a study entitled, "Genotoxicity of Select Herbicides in *Rana catesbeiana* Tadpoles Using the  Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay." Genotoxicity refers to the property of chemical agents which

cause damage to genetic information within a cell causing mutations, which may lead to cancer. In Clements' publication, tadpoles were exposed to various herbicides, including Roundup, for a 24-hour period. Roundup-treated tadpoles showed "significant DNA damage when compared with unexposed control animals."

48.     In 1999, Lennart Hardell and Mikael Eriksson published a study entitled, "A Case–Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," which consisted of a population-based case–control study in northern and middle Sweden encompassing 442 cases and twice as many controls was performed. Exposure data were ascertained by comprehensive questionnaires, and the questionnaires were supplemented by telephone interviews. The results indicated exposure to glyphosate and other herbicides yielded increased risks for NHL.

49.     In 2002, Julie Marc, *et al.* published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found Roundup caused delays in the cell cycles of sea urchins. It further noted the deregulations of cell cycle checkpoints are *directly linked* to genomic instability, which can generate diseases and cause cancer. The findings led to the conclusion Roundup "causes changes in cell cycle regulation that may raise questions about the effect of this pesticide on human health."

50.     In 2003, A. J. De Roos, et al. published a study entitled, "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," which "[r]eported use of several individual pesticides was associated with increased NHL incidence, including . . . glyphosate. A subanalysis of these 'potentially carcinogenic' pesticides suggested a positive trend of risk with exposure to increasing numbers."

51.    In 2004, Julie Marc, *et al.* published a study entitled, "Glyphosate-based pesticides affect cell cycle regulation." In that study, which tested Roundup 3plus on sea urchin eggs, determined "glyphosate-based pesticides are clearly of human health concern by inhalation in the vicinity of spraying," given the "molecular link between glyphosate and cell cycle dysregulation."  It observed, "roundup may be related to increased frequency of non-Hodgkin's lymphoma among farmers," citing the study by A. J. De Roos., *et al*.

52.    In 2005, Francisco Peixoto published a study entitled, "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," which suggested the harmful effects of Roundup could be the result of Roundup's specific combination of chemicals, and the interaction of glyphosate and the surfactant POEA.

53.    In 2008, Mikael Eriksson, *et al.* published a study entitled, "Pesticide exposure as risk factor for NHL including histopathological subgroup analysis," based on a case-control study of exposure to various pesticides as a risk factor for NHL. Eriksson's study strengthened previous associations between glyphosate and NHL.

54.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study entitled, "Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells," which examined the effects of four different Roundup formulations on human umbilical, embryonic, and placental cells—at dilution levels far below agricultural recommendations. The study found the formations caused cell death in a few hours in a cumulative manner, caused DNA damage, and found that the formulations inhibit cell respiration. In addition, it was shown the mixture of the components used as Roundup adjuvants,

particularly POEA *amplified the action of the glyphosate*. The Roundup adjuvants actually changed human cell permeability and increased the toxicity of glyphosate alone.

55.    This study suggests Roundup poses even greater risks than glyphosate alone, as a result of Roundup's specific combination of chemicals, and the interaction of glyphosate and POEA.

**C.    Glyphosate-Based Herbicides, Including Roundup, are Banned Throughout the World.**

56.    Following the IARC's report on glyphosate, several countries have issued outright bans or restrictions on glyphosate herbicides, including Roundup.

57.    In May 2015, the Netherlands banned all non-commercial use of glyphosate. *See* https://www.collective-evolution.com/2015/05/30/why-the-netherlands-just-banned-monsantos-glyphosate-based-herbicides/.

58.    In 2016, Italy adopted a law prohibiting the use of glyphosate in areas frequented by the public or by "vulnerable groups" including children and the elderly and in the pre-harvest phase in agriculture. *See*   https://www.soilassociation.org/news/2016/august/italy-bans-toxic-glyphosate/.

59.    In June 2017, the Flemish government approved a ban on glyphosate for individual-use.  *See*   https://www.brusselstimes.com/all-news/belgium-all-news/43150/flemish-government-approves-ban-on-glyphosate-for-individuals/.

60.    In September 2018, the agriculture ministry of the Czech Republic stated the country would ban the blanket use of glyphosate as a weedkiller and as a drying agent. *See* https://phys.org/news/2018-09-czech-republic-restrict-glyphosate-weedkiller.html. The ban came

into effect on January 1, 2019. *See* http://www.arc2020.eu/czech-out-this-roundabout-way-to-not-ban-roundup/.

61.     In October 2018, the Indian state of Punjab banned the sale of glyphosate. *See* https://www.thehindu.com/news/national/other-states/punjab-government-bans-sale-of-herbicide/article25314146.ece. And in February of 2019, the Indian state of Kerala followed suit, issuing a ban on the sale, distribution and use of glyphosate. *See* https://www.thenewsminute.com/article/kerala-government-bans-glyphosate-deadly-weed-killer-96220.

62.     In January 2019, French authorities banned the sale of Roundup following a court ruling that regulators failed to take safety concerns into account when clearing the widely used herbicide. *See* https://www.france24.com/en/20190116-weedkiller-roundup-banned-france-after-court-ruling. In April 2019, a French appeals court ruled Bayer's Monsanto business was liable for the health problems of a farmer who inhaled Roundup. *See* https://www.insurancejournal.com/news/international/2019/04/11/523456.htm.

63.     In March 2019, Vietnam announced it has banned the import of all glyphosate-based herbicides. *See* https://sustainablepulse.com/2019/03/25/vietnam-bans-import-of-glyphosate-herbicides-after-us-cancer-trial-verdict/#.XS-xCT9Kh9O.

64.     In July 2019, Austria's Parliament passed a bill banning all uses of glyphosate. *See* https://www.reuters.com/article/us-austria-glyphosate/austrian-parliament-backs-eus-first-total-ban-of-weedkiller-glyphosate-idUSKCN1TX1JR. Although the ban was supposed to take effect on January 1, 2020, Austria's Chancellor refused to sign it into law due to a legal technicality.

*See* https://www.reuters.com/article/us-austria-glyphosate/austrian-leader-blocks-ban-on-weedkiller-glyphosate-citing-technicality-idUSKBN1YD11Z.

65.    In January 2020, Luxembourg issued a total ban on glyphosate. *See* https://www.brusselstimes.com/all-news/eu-affairs/92006/luxembourg-will-be-first-eu-country-to-totally-ban-glyphosate/.

66.    Several municipalities and regions in Spain, the United Kingdom, and the United States, have also banned glyphosate herbicides.

**D.    Monsanto Loses Three Verdicts after Roundup is Found to Cause Cancer in Humans.**

67.    On August 10, 2018, a unanimous California jury in *Johnson v. Monsanto Co.,* No. CGC16550128 (Cal. Super. Ct., Cnty. of S.F.) found Monsanto's Roundup and Ranger Pro herbicides were unsafe and were a substantial factor in causing harm to the plaintiff.  The jury also found Monsanto failed to adequately warn customers of the risks associated with its Roundup and Ranger Pro products, and that the company acted with malice or oppression. The jury awarded the plaintiff a total of $289 million, with $250 million in punitive damages and $39.25 million in compensatory damages. The court later reduced the punitive damages award, bringing the total award to $78.5 million. Monsanto appealed the judgment and the California Court of Appeal, on July 20, 2020, affirmed the trial court's judgment, but reduced the total award to $20.6 million.

68.    On March 27, 2019, a unanimous California jury in *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal.) found Monsanto liable for failing to warn Roundup could cause cancer, liable for negligence, and liable in a design defect claim. The jury awarded the plaintiff a total of $80.27 million, with $75 million in punitive damages and $5.27 million in

compensatory damages. The trial judge later reduced the punitive damages award, bringing the total award to $25.27 million. The Ninth Circuit Court of Appeals affirmed the judgment on appeal.

69.     On May 13, 2019, a California jury found Monsanto likely caused a couple's cancer in *Pilliod v. Monsanto Co.,* No. RG17862702 (Cal. Super. Ct., Cnty. of Alameda). The jury found on a preponderance of the evidence Roundup was a significant contributing factor in causing the plaintiff's NHL. The jury awarded the plaintiffs a total of $2.055 billion, with $2 billion in punitive damages and $55 million in compensatory damages. The court later reduced the punitive and compensatory damages awards, bringing the total award to $87 million. The California Court of Appeal affirmed the judgment on appeal.

## F.     Bayer Agrees to Pay Over $10 Billion to Settle Personal Injury Suits

70.     Thousands of other personal injury (including wrongful death) claims have been filed against Monsanto claiming the Product caused the plaintiffs to develop cancer. They have been coordinated in a multi-district litigation, specifically: *In re Roundup Products Liability Litigation*, Case No. 3:16-md-02741 (N.D. Cal.).

71.     On June 24, 2020, Bayer Corporation, the maker of Roundup and owner of Monsanto, announced it had reached agreements to resolve tens of thousands of personal injury cases for between $8.8 and 9.6 billion.. These cases were brought by individuals who claim their use of Roundup caused their non-Hodgkin's (i.e., "NHL"). *See In re Roundup Products Liability Litigation,* Case No. 3:16-md-02741.

72.     In addition to, but separate from, the individual personal injury cases, Bayer also announced that it had agreed to resolve a proposed "future claims" class action on behalf of

everyone who was exposed to Roundup (but had not yet hired a lawyer to bring a tort claim, with subclasses for people who already have cancer and those who do not) for an additional $1.1 billion. This causation-focused "future claims" class action complaint was filed on June 24, 2020, concurrent with a motion for preliminary approval. The "future claims" class action complaint seeks certification of an issue class under Rules 23(b) and (c)(4) for "a litigated determination of the general causation dispute on a class-wide basis." *See In re Roundup Products Liability Litigation*, Case No. 3:16- md-02741, Dkt. No. 11042 (N.D. Cal. June 24, 2020) (Motion for Preliminary Approval of Class Action Settlement).

73.    The "future claims" class settlement was initially withdrawn after the judge in the MDL expressed concerns about the terms. It was then refiled in a modified form in February 2021. *Id.*, Dkt. No. 12531 (Renewed Motion for Preliminary Approval). Ultimately, the Court rejected that settlement, concluding that its terms were not reasonable as to class members who had not yet been diagnosed with cancer but would nonetheless give up certain rights as to their future personal-injury claims. *Id.*, Dkt. No. 13115. Had the proposed "future claims" class settlement ultimately been approved by the Court, it would have bound all individuals who were exposed to Roundup at any time in any manner, but who had not yet retained counsel. *Id.*, Dkt. No. 1231.

74.    Several of the "future claims" class action complaint and settlement terms—most notably the proposed class notice—support Plaintiff's claims in the instant lawsuit. For example, in the $50 million Monsanto-funded notice plan for the "future claims" class settlement, Monsanto agreed to notify class members of Roundup's potential to cause cancer by direct mail, email, posters for retailers to display in their stores, and through multi-national and local media.

*Id*. As later discussed herein, this is essentially the *same form of relief Plaintiffs seek here*: disclosure of Roundup's potential carcinogenicity in a manner not involving a label change.

75.    If approved, the proposed notice plan would have alerted "future claims" class members to the creation of a registration process to encourage class members to come forward and identify themselves and establish eligibility for certain "class benefits." *Id*. The class benefits in the "future claims" class settlement included a Diagnostic Accessibility Grant Program ("DAGP"), which is a medical outreach and assistance program that would have distributed grants to existing medical clinics and healthcare providers offering diagnostic services to class members who have not been diagnosed with NHL. *Id*. Furthermore, the class benefits included a Research Funding Program ("RFP"), which would have funded medical and scientific research into the diagnosis and treatment of NHL. *Id*. Notice would have been targeted to "large groups of individuals who may be itinerant, lack exposure to traditional media, or do not speak English as a first language." *Id.*

76.    The approximately 200-page "future claims" class settlement agreement also included the creation of an independent "Advisory Science Panel," which would have considered a broad set of scientific materials and issued an advisory, but admissible, answer to the question of whether exposure to Roundup can cause non-Hodgkin's lymphoma in humans and, if so, at what "threshold internal dose level." *Id.* The Advisory Science Panel would have been required, under the terms of the proposed class settlement, to issue its causation finding in four years, and not earlier. *Id*. In exchange, "future claims" class members—broadly defined as anyone ever exposed to Roundup (who, as of June 24, 2020, had not retained counsel)—would have forever waived their right to punitive damages and be barred from filing a case against Monsanto during

this four-year period. *Id*. In the meantime, the settlement fund would have been used to provide the aforementioned "class benefits" and to compensate class members diagnosed with NHL who applied for, received, and accepted an award. . *Id*.

77.   By agreeing to the creation of the Advisory Science Panel, Monsanto acknowledged the existence of an ongoing scientific dispute as to whether exposure to Roundup has the potential to cause NHL.[4]

**G.     California's Classification of Glyphosate as a Chemical Known to Cause Cancer.**

78.   On July 7, 2017, following the IARC's classification of glyphosate, California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as a chemical known to the State of California to cause cancer, pursuant to the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65").

79.   Proposition 65 prohibits retailers and manufacturers from knowingly and intentionally exposing California consumers to a chemical known to the State of California to cause cancer or developmental or reproductive harm without first providing a "clear and reasonable warning."

80.   In response to OEHHA's inclusion of glyphosate on the Proposition 65 list, Monsanto, CropLife America, and several growers associations filed a motion alleging the IARC

---

[4] After the proposed future-claims settlement was rejected by the MDL court, Monsanto's parent company issued a press release on May 27, 2021, stating that it would create and promote a new website with scientific studies relevant to Roundup®'s safety and request that EPA approve corresponding language on Roundup® product labels, "engage with partners" to discuss the continued availability of Roundup® in the residential market, consider the creation of an independent scientific advisory panel to review scientific information on the safety of Roundup®, and continue its litigation efforts.

classification of glyphosate is contrary to the international scientific consensus and that requiring a Proposition 65 warning would be misleading to the ordinary consumer.

81.     On February 26, 2018, the Eastern District Court of California issued a preliminary injunction precluding OEHHA from enforcing its Proposition 65 warning requirements against glyphosate registrants, which would have taken effect on July 7, 2018. This injunction was made permanent on June 22, 2020. The Court however did not rule that glyphosate should be removed from the Proposition 65 list.

82.     On August 7, 2019, EPA's Office of Pesticide Program ("OPP") issued a letter to registrants of glyphosate products (the "OPP Letter") stating a Proposition 65 warning statement on glyphosate-based products would be "false and misleading" and would render them misbranded under FIFRA. The OPP letter was not the product of any formal proceedings, nor was it published in the Federal Register.

## H.     The EPA's Registration Review for Glyphosate

83.     Since glyphosate's first registration, EPA has reviewed and reassessed its safety and uses, including undergoing registration review, a program that re-evaluates each registered pesticide on a 15-year cycle.

84.     In January 2020, after receiving and considering public comments, EPA issued its Interim Registration Review Decision for glyphosate, finding "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." EPA stated it "will continue to monitor the open literature for studies that use

scientifically sound and appropriate methodology and relevant routes of exposure that have the potential to impact the risk evaluation of glyphosate."[5]

85.    EPA's review of glyphosate, however, was based on an incomplete and distorted factual record, largely due to efforts on the part of Monsanto to conceal glyphosate's risks. As described herein, Monsanto withheld relevant scientific evidence from EPA, in violation of federal law, and manipulated the scientific debate about glyphosate-based herbicides by "ghostwriting" scientific papers.

86.    Through the numerous personal injury and wrongful death lawsuits filed against Monsanto, which total in the tens of thousands, Monsanto obtained extensive medical documentation showing a link between Roundup and various types of cancer.

87.    The plaintiffs in the three California cases resulting in favorable jury verdicts for the plaintiffs (as described above) submitted medical records and expert testimony showing that Roundup caused those plaintiffs to develop cancer. Importantly, all of this medical documentation and information would have been provided to the Monsanto.

88.    Despite the exorbitant amount of medical information in Monsanto's possession that Roundup and/or glyphosate can cause cancer, as generated just by the three California cases, Monsanto did not turn any of this information over to EPA.

89.    Monsanto failed to comply 40 C.F.R. § 159.152, which requires "applicants to submit, as part of an application for registration, any factual information of which [it] is aware regarding unreasonable adverse effects of the pesticide on humans or the environment." *Id.*

---

[5] As of March 2020, multiple groups have sued EPA over its Interim Registration Review Decision for glyphosate. These groups include Center for Food Safety, Beyond Pesticides, the Rural Coalition, Organización en California de Lideres Campesinas, the Farmworker Association of Florida, Natural Resources Defense Council, and Pesticide Action Network North America.

Defendant's refusal to provide such information, including medical records and information provided to Monsanto in the thousands of personal injury lawsuits, to EPA constituted deception by omission and deprived this agency from making an informed decision as to whether Roundup is safe for human exposure and further deprived the opportunity for EPA from reaching an informed conclusion regarding Roundup's potential carcinogenicity.

90.     Defendant indeed has had a history of misleading the EPA regarding Roundup's potential carcinogenicity, by deception and omission.

91.     Beginning in the 1990s, as numerous studies found an association between Roundup and Non-Hodgkin Lymphoma (as described herein *supra*), Monsanto hired Dr. James Parry, a world-renowned genotoxicologist, to rebut the growing scientific consensus Roundup is genotoxic. This tactic backfired: Following his review, Dr. Parry provided a report to Monsanto that "glyphosate is capable of producing genotoxicity both in vivo and in vitro . . . ." Dr. Parry recommended that Monsanto conduct research on the genotoxicity of glyphosate-based herbicides; the mechanisms giving rise to genotoxicity; and the relevance of these mechanisms to the safety of glyphosate-based herbicides.

92.     Monsanto decided not to conduct the research Dr. Parry asked it to perform. Dr. Parry offered to conduct the research himself, but Monsanto refused. Monsanto's goal was not actually to determine whether glyphosate-based herbicides caused cancer but rather to find an expert that could influence regulators when genotoxicity issues arise. Monsanto failed to produce the Parry Report to EPA as required under 40 C.F.R. § 159.158. Because Dr. Parry never came around to Monsanto's view of the science, Monsanto would not let him speak to regulators and his report was never submitted to EPA.

93.   Monsanto has also engaged in the practice of "ghostwriting" scientific papers to establish the safety of glyphosate-based herbicides, which, when published, appear to be authored by independent academic scientists.

94.   A noteworthy example is a paper published in 2000 purportedly written by G. M. Williams, *et al.* entitled, "Safety evaluation and risk assessment of the herbicide roundup and its active ingredient, glyphosate, for humans." This paper concluded "Roundup herbicide does not pose a health risk to humans." Although no Monsanto employee is listed as an author, William Heydens, a Monsanto employee, admits that he wrote the manuscript and provided final edits to the paper. EPA has consistently relied on this paper when considering the safety of glyphosate-based herbicides.

95.   Another example of Monsanto's surreptitious involvement in the science of glyphosate can be found in a memo dated August 4, 2015 by Monsanto scientist David Saltmiras, stating he "ghost wrote cancer review paper Greim, et al. (2015)." That paper, entitled, "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies," concluded "glyphosate does not present concern with respect to carcinogenic potential in humans." EPA has consistently relied on this paper when considering the safety of glyphosate-based herbicides.

96.   Immediately after IARC deemed glyphosate a probable carcinogen, Monsanto devised a response plan that included convening an expert panel to "[p]ublish comprehensive evaluation of carcinogenic potential by credible scientists" that could later be used for litigation support. It worked with Intertek, an industry consultancy firm, to create a false impression that the expert panel was independent.

97.    On September 28, 2016, the "independent" expert panel published its conclusions in the journal Critical Reviews in Toxicology, in a paper entitled "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." The paper concluded glyphosate was "unlikely to pose a carcinogenic risk to humans."

98.    Included in the paper was a "Declaration of Interest," which stated: "[t]he Expert Panelists . . . were not directly contacted by the Monsanto Company" and that "neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." These statements were blatantly false. Monsanto recruited, selected, and had direct contact with the experts, some of them receiving payments from Monsanto. Moreover, Monsanto was engaged in organizing, reviewing, and editing of the drafts, and had ultimate authority over the paper's content.

99.    The foregoing represent just a handful of the many scientific articles ghostwritten by Monsanto to manipulate the scientific debate about glyphosate-based herbicides, including Roundup, and to prevent regulators like EPA from learning their true risks.

## I.    Monsanto's Failure to Warn Consumers of Roundup's Carcinogenic Properties.

100.    Defendant's promotion, marketing, advertising, distribution, and labeling of Roundup leads reasonable consumers into believing Roundup is safe for its intended use, when it is not. Exposure to Roundup has the potential to cause cancer in humans, as explained herein.

101.    Defendant does not warn consumers of Roundup's potential to cause cancer or, at least, that there is a vigorous scientific dispute about Roundup's potential to cause NHL in humans.

102.   Customers rely on Defendants to offer quality and safe products. But instead of putting its customers' safety first and informing consumers about Roundup's potential health risks, Defendant manufactured, labeled, and marketed a potentially deadly product without any warning, all for its own financial benefit.

103.   Defendant's focus on its own financial gain is evidenced by its refusal to submit medical information evidencing a link between Roundup and cancer to EPA.

104.   Defendant was aware of the substantial danger to consumers while using Roundup, however Defendant did not notify consumers that exposure to Roundup could potentially cause cancer, including NHL.

105.   Defendant could and can notify consumers of the potential health risks by, among other things, providing information on its webpages for Roundup, in television and radio commercials, in-store signage, such as point-of-sale or shelf tags, posters,  or press releases—yet has not done so.

106.   Plaintiffs and other consumers were not warned by Monsanto and therefore did not know that using Roundup exposed them to chemicals that are hazardous and potentially carcinogenic to humans.

107.   Whether exposure to Roundup has the potential to cause cancer in humans would be important in a consumer's decision whether to purchase Roundup.

108.   The existence of an ongoing scientific debate about whether exposure to Roundup Products can cause NHL in humans would also be important in a consumer's decision whether to purchase Roundup.

**J.       Plaintiffs' Purchase of Roundup**

Plaintiff Gilmore

109.  Plaintiff Gilmore has purchased Roundup Ready-to-Use Weed & Grass Killer III on multiple occasions, and his most recent purchase was in December 2018 from a Home Depot location in Multnomah County, Oregon.

110.  When Plaintiff Gilmore purchased the Roundup Ready-to-Use Weed & Grass Killer III, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

111.  Had Plaintiff Gilmore known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, he would not have purchased it.

112.  Plaintiff Gilmore learned Roundup had the potential to cause cancer after purchasing the Roundup Ready-to-Use Weed & Grass Killer III. At that time, Plaintiff Gilmore stopped using the Product, which had not yet been consumed in its entirety.

Plaintiff Weeks

113.  Plaintiff Weeks has purchased Roundup several times a year for the last ten years. For the last few years Plaintiff Weeks has been purchasing Roundup Ready-to-Use Weed and Grass Killer III from a Home Depot location in Oxnard, California. Plaintiff Weeks's most recent purchase was on April 9, 2019. At that time, he purchased a 1.25 gallon bottle of the Roundup Ready-to-Use Weed & Grass Killer III refill, which was priced at $15.97.

114.  When Plaintiff Weeks purchased the Roundup Ready-to-Use Weed & Grass Killer III refill, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages

disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

115.   Had Plaintiff Weeks known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, he would not have purchased it.

Plaintiff Taylor

116.   Plaintiff Taylor has purchased at least two Roundup products over the last several years from a Costco location in Shasta County, California.

117.   When Plaintiff Taylor purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

118.   Had Plaintiff Taylor known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, he would not have purchased it.

Plaintiff Hanna

119.   Plaintiff Hanna purchased a Roundup product from a Walmart location in Yucca Valley, California during the Spring of 2019.

120.   When Plaintiff Hanna purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

121.  Had Plaintiff Hanna known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, she would not have purchased it.

Plaintiff Williams

122.  Plaintiff Williams has purchased at least four Roundup products (including Roundup Extended Control Weed & Grass Killer Plus Weed Preventer II, Ready-To-Use Weed and Grass Killer III with Pump 'N Go 2 Sprayer, and Roundup Ready-to-Use Weed & Grass Killer III) over the last several years from a Lowe's location in Lake Elsinore, California.

123.  When Plaintiff Williams purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

124.  Had Plaintiff Williams known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, she would not have purchased it.

Plaintiff Boyette

125.  Plaintiff Boyette purchased a Roundup product from a Lowe's location in Texarkana, Texas on or about July 2019.

126.  When Plaintiff Boyette purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

127. Had Plaintiff Boyette known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, she would not have purchased it.

Plaintiff Ezcurra

128. Plaintiff Ezcurra purchased Roundup® Ready-to-Use Weed and Grass Killer from a Home Depot store Palm Beach County, Florida on or about November 15, 2019.

129. When Plaintiff Ezcurra purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

130. Had Plaintiff Ezcurra known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, he would not have purchased it.

Plaintiff Jewell

131. Plaintiff Jewell has routinely purchased Roundup products over the last several years from a Walmart location in Miller County, Arkansas.

132. When Plaintiff Jewell purchased Roundup, neither the Roundup label, nor in-store advertisements, nor Monsanto's webpages disclosed Roundup had the potential to cause cancer or, at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

133. Had Plaintiff Jewell known exposure to Roundup had the potential to cause cancer, or that there was an ongoing scientific dispute concerning its potential carcinogenicity, he would

not have purchased it.

K.      **Plaintiffs' Measurable Economic Injury**

134.   Plaintiffs and the Class paid a price premium for the Product given Roundup's potential carcinogenicity was undisclosed. Indeed, Defendant has implicitly advertised Roundup as safe, and thus "superior" to other weed and grass killers on the market. As such, the product is worth less than what Plaintiffs and the Class paid.

135.   Had Defendant disclosed Roundup's links to cancer, it would not have been able to command such a high price. In other words, but for Defendant's omissions, the actual price Plaintiffs and Class Members paid would have and should have been less.

## CLASS ALLEGATIONS

136.   Plaintiffs re-allege an incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Class Action Complaint as if fully set forth herein.

137.   Plaintiffs bring this class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following Class (the "Class"):

>    **All persons in the United States who purchased Roundup in the United States other than for resale or distribution.**

138.   The following are excluded from the Class: Defendant, its parent company, subsidiaries, affiliates, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; and judicial officers and associated court staff assigned to this case.

139.  Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those claims in individual actions alleging the same claims.

**A.      Federal Rules of Civil Procedure, Rule 23(a) Factors.**

140.  **Numerosity**: The members of the Class are so numerous that individual joinder of all class members is impracticable. The precise number of members of the Class is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number that would make joinder practicable, particularly given Defendants' comprehensive distribution and sales network throughout the United States.

141.  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, in-store signage, shelf tags, and/or published notice in newspapers, magazines, or other periodicals.

142.  **Commonality.** This action involves common questions of law or fact, which predominate over any questions affecting individual members of the Class. All members of the Class were exposed to Defendants' deceptive and misleading advertising and marketing claims and/or omissions alleged herein. Common questions of law or fact include:

> a.  whether Defendant, in its promotion, marketing, advertising, and labeling of Roundup, concealed, suppressed, or omitted material facts—i.e. Roundup's potential to cause cancer;
>
> b.  whether Defendant acted with the intention that others rely on such concealment, suppression or omission;

c.  whether Defendant's concealment, suppression or omission of Roundup's potential to cause cancer is material to reasonable consumers;

d.  whether Defendant's promotion, marketing, advertising, and labeling of Roundup caused Plaintiffs and the Class to suffer an ascertainable loss;

e.  whether Defendant violated the DCFA; and

f.  whether Plaintiffs and the other members of the Class are entitled to damages under the DCFA and their breach of warranty claim.

143.  Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually, and on behalf of the other members of the Class. Similar or identical statutory legal violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

144.  **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all members of the Class were comparably injured through the same uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

145.  **Adequacy.** Plaintiffs are adequate representatives of the members of the Class because their interests do not conflict with the interests of the other members of the Class that Plaintiffs seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

Undersigned counsel has represented consumers in a wide variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

**C.      Federal Rules of Civil Procedure, Rule 23(b)(3) Factors.**

146.   **Common Issues Predominate**: As set forth in detail hereinabove, common issues of fact and law predominate because Plaintiffs' claims are based on a deceptive common course of conduct. Whether Defendant's conduct is likely to harm reasonable consumers and violate the DCFA and constitute a breach of warranty is common to all members of the Class and are the predominating issues, and Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

147.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

   a.   Given the size of the claims of individual Class members, as well as the resources of Defendant, few Class members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

   b.   This action will permit an orderly and expeditious administration of the claims of Class members, will foster economies of time, effort, and expense ad will ensure uniformity of decisions;

   c.   Any interest of Class members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system; and

d.  Without a class action, Class members will continue to suffer damages, Defendant's violations of law will proceed without remedy, and Defendant will continue to reap and retain the substantial proceeds derived from its wrongful and unlawful conduct. Plaintiffs and Class members have suffered damages as a result of Defendant's unlawful and unfair conduct. This action presents no difficulties that will impede its management by the Court as a class action.

## CAUSES OF ACTION

**COUNT I:  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT ("DCFA"),**

**Del. Code Ann. tit. 6, § 2511, *et seq.***

148.  Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

149.  The Delaware Consumer Fraud Act ("DCFA") prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." Del. Code Ann. tit. 6, § 2513.

150.  The purpose of the DCFA is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State." Del. Code Ann. tit. 6, § 2512.

151.  Defendant was, at all times relevant hereto, a "person" as defined by Del. Code

Ann. tit. 6, § 2511(7).

152.   Roundup was, at all times relevant hereto, "merchandise" as defined by Del. Code Ann. tit. 6, § 2511(6).

153.   Defendant engaged in the "sale" and "advertisement" of Roundup as defined by Del. Code Ann. tit. 6, §§ 2511(1), (8), 2513.

154.   Defendant indeed was responsible for the manufacture, promotion, marketing, advertising, distribution, labeling, and sale of Roundup.

155.   Defendant concealed, suppressed, or omitted material facts with intent that others rely upon such concealment, suppression or omission, in violation of Del. Code Ann. tit. 6, § 2513.

156.   Specifically, Defendant failed to disclose—on the Roundup label, on its webpages, on in-store advertisements, and through other means of disclosure—Roundup's potential to cause cancer including, at the very least, the existence of an ongoing scientific debate as to whether exposure to Roundup can cause NHL in humans.

157.   Defendant should have been aware of the risks of Roundup due to the information available to it, particularly since Defendant manufactures the Products, *supra*.

158.   The facts Defendant concealed, suppressed, or omitted are material because a reasonable consumer would consider them important factors in deciding whether to purchase Roundup.

159.   Defendant's omissions were uniform and material and constituted a continuing course of conduct of misleading and deceptive business practices.

160.   Plaintiffs did not know exposure to Roundup had the potential to cause cancer at

the time they purchased it. Plaintiffs would not have purchased Roundup had they known it had the potential to cause cancer, or that there has been an ongoing scientific debate as to whether exposure to Roundup can cause NHL in humans.

161.   Plaintiffs suffered an economic injury because the economic benefit they received in purchasing Roundup was worth less than the economic benefit for which they bargained due to its potential carcinogenicity.

162.   Plaintiffs therefore seek damages as a result of Defendants' violations of the DCFA. *See* Del. Code Ann. tit. 6, § 2525 ("A private cause of action shall be available to any victim of a violation of this subchapter").

163.   Plaintiffs further seek reasonable costs and attorneys' fees in pursuit of this Action.

## COUNT II: BREACH OF WARRANTY

164.   Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

165.   Defendant markets Roundup® products as "safe" general purpose herbicides for consumer use and still markets and advertises Roundup® as safe today.

166.   Roundup's labeling provides certain warnings, such as "Keep Out of Reach of Children" and "Caution."  But while the labeling purports to identify the hazards posed, the only hazard included is that the product may cause "moderate eye irritation."

167.   Defendant thus warrants that the only hazard posed by the product is "moderate eye irritation."

168.   Defendants also implicitly warrants that the product is fit for its ordinary purpose of

safely killing weeds, when in fact it is not, due to possible risk of cancer posed by the ordinary and foreseeable use of Roundup®.

169.   Defendant thus breached its warranties for Roundup®.

170.   As a proximate result of the breach of warranties by Monsanto, Plaintiffs and the members of the Class did not receive Roundup® as warranted and did not receive the benefit of their bargain. They have, therefore, been injured and suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually, and on behalf of all other similarly situated, pray for relief pursuant to each cause of action set forth in this Complaint as follows:

i.   For actual damages in an amount to be determined at trial for the causes of action set forth in Counts I and II;

ii.   For an award of attorney's fees and costs;

iii.   For any other relief the Court might deem just, appropriate, or proper; and

iv.   For an award of pre- and post-judgment interest on any amounts awarded.

Respectfully submitted,

DATE: June 10, 2021                    RHODUNDA WILLIAMS & KONDRASCHOW

By:  */s/ William J. Rhodunda, Jr.*

Chandra J. Williams (No. 4907)
Brandywine Plaza West
1521 Concord Pike, Suite 205
Wilmington, DE 19803
(302) 576-2000 (telephone)
(302) 576-2004 (facsimile)
Bill@rawlaw.com
Chandra@rawlaw.com

-and-

MILSTEIN JACKSON
FAIRCHILD & WADE, LLP
Gillian L. Wade (to be admitted *pro hac vice*)
gwade@mjfwlaw.com
Sara D. Avila (to be admitted *pro hac vice*)
savila@mjfwlaw.com
Marc A. Castaneda (to be admitted *pro hac vice*)
mcastaneda@mjfwlaw.com
10250 Constellation Boulevard
14th Floor
Los Angeles, California 90067
Telephone: (310)396-9600
Facsimile: (310)396-9635