GILLIAN L. WADE (State Bar No. 229124)
SARA D. AVILA (State Bar No. 263213)
MARC A. CASTANEDA (State Bar No. 299001)
Milstein, Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
savila@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
Law Offices of Howard Rubinstein
joel@joelosterlaw.com
22052 W. 66th St. #192
Shawnee, Kansas 66226

*Attorneys for Plaintiffs and the Proposed Settlement Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT GILMORE, et al., | MDL No. 2741 |
| Plaintiffs, | Case No. 3:21-cv-08159 |
| vs. | **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT** |
| MONSANTO COMPANY, | Date:    Jan. 12, 2023 |
| Defendant. | Time:    2:30 p.m.<br>Place:    Via Zoom Webinar<br>Judge:  Hon. Vince G. Chhabria |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE THAT** on January 12, 2023, at 2:30 p.m., via Zoom Webinar ID: 161 285 7657, Password: 547298, Plaintiffs Scott Gilmore, James Weeks, Paul Taylor, Sherry Hanna, Amanda Boyette, Julio Ezcurra, Anthony Jewell, and Kristy Williams (collectively, "Plaintiffs") will and hereby do move this Court pursuant to Federal Rules of Civil Procedure, Rule 23, for an order granting final approval of the proposed Second Amended Class Action Settlement Agreement and exhibits thereto (the "Settlement")[1], reached in this case in February 2021.[2]

Plaintiffs respectfully move for entry of an order which: (1) grants final approval of the Settlement; (2) finally certifies the Settlement Class; (3) orders Defendant Monsanto Company to comply with the relief described in the Settlement; (4) authorizes the Claims Administrator to administer the settlement benefits to the Settlement Class Members who submitted valid claims; (5) overrules any objections to the Settlement; (6) authorizes the entry of a final judgment of the Action  provided for in the Settlement; (7) awards service awards to the Plaintiffs in the amount of $5,000 each; and (8) awards attorneys' fees of $11,250,000 plus reimbursement of expenses of $210,888.

This Motion is based on this Notice and Motion, the Memorandum of Points and Authorities below, the declarations of Gillian L. Wade and Brandon Schwartz and evidence filed concurrently herewith, the [Proposed] Order submitted herewith, the previously-filed motion for preliminary approval and accompanying documents, declarations, and briefing, including the oppositions to the motion and the motion for discovery, the previously-filed Motion for Attorneys' Fees, Costs, and Incentive awards and accompanying documents and declarations, and the November 14, 2022 letter to the Court (Dkt. Nos. 97, 99, 101, 116, 105, 106, 108, 109, 110, 116,

---

[1] Unless otherwise stated, all capitalized terms refer to the terms defined in the Second Amended Class Action Settlement Agreement, attached to ECF No. 94-1 at pages 18 to 57.

[2] Following a successful mediation in February 2021, the original Settlement Agreement was signed in June 2021, and subsequently amended.

118, 120, 122, and 124), the complete file and record in this action and the Related Actions described in section A(46) of the Settlement, and any other such information, evidence, and argument as the Court may consider. Defendant Monsanto Company ("Monsanto") does not oppose this motion.

Per the Procedural Guidance for Class Action Settlements, "Final Approval Rule 1, CLASS MEMBERS' RESPONSE", Plaintiffs further note the following regarding the Settlement Class certified in the Court's June 21, 2022 Order Granting preliminary approval:

1.      The Agreement and Notice Plan did not require mail notice of the Settlement. However, 154 individuals requested notice or claim packets by mail. Of those, 3 were undeliverable. *See* concurrently-filed Declaration of Brandon Schwartz ("Schwartz Decl."), ¶ 22.

2.      In addition to the other forms of notice (print publication notice, digital banner notice online, digital newsletters, television, sponsored search advertising, third-party class action settlement website and related opt-in digital newsletter, and Press Release), the Claims Administrator purchased a list of approximately 3,500,000 email addresses of individuals that have an interest in lawn and garden maintenance, many of whom are likely Settlement Class Members. The number of undeliverable E-Mail notices was approximately 906,130, and, ultimately, the email notice was successfully delivered to 2,845,608 email addresses. *See* concurrently-filed Declaration of Brandon Schwartz ("Schwartz Decl."), ¶¶ 16-18.

3.      Class Members submitted between 226,268 and 230,097 net valid claims worth between $12,710,305.50 and $14,209,643.50.[3] Schwartz Decl. ¶ 32.

4.      Only seven Class Members opted out of the Settlement. *See* Schwartz Decl. ¶ 39.

---

[3] The actual value will depend on the Claims Administrator's review of certain claims yet to be reviewed and deficient claims (claims submitted with product values exceeding the threshold [one Product for each year of the Class Period] and/or with claimed purchases of the three Products that require proof of purchase, for which the documents submitted by the claimant did not substantiate the products claimed). Schwartz Decl. ¶ 33. Deficient claims have been sent a deficiency notice and provided an opportunity to cure the defect. *Id.*

5.      As of the date of this motion, except for the objections to preliminary approval that this Court has already considered and overruled, no objections have yet been filed. Neither Class Counsel nor the Settlement Administrator are aware of any members of the Settlement Class who objected to or commented on the Settlement in writing, pursuant to the process for such objections set forth in the Settlement Agreement or otherwise. Agreement § K; PA Order ¶ 15. *See* Schwartz Decl. ¶ 40, and concurrently-filed Declaration of Gillian L. Wade in Support of Plaintiffs' Motion for Final Approval ("Wade Decl.") ¶ 3. Another week remains for Settlement Class Members to file objections.

Dated: November 28, 2022

By:      /s/ Gillian L. Wade

GILLIAN L. WADE
SARA D. AVILA
MARC A. CASTANEDA
Milstein, Jackson, Fairchild & Wade, LLP
gwade@mjfwlaw.com
savila@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024

*Counsel for Plaintiffs and the Settlement Class*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

HISTORY OF THE LITIGATION ......................................................................................2

    A.    BACKGROUND ..........................................................................................2

        1.    Litigation History...........................................................................3

        2.    Plaintiffs' Multi-Faceted Litigation Strategy Brings Monsanto to the Table.....7

        3.    Plaintiff Entered Mediation with a Wealth of Information ...............................7

        4.    Mediation and the Proposed Settlement Resolves All of the Actions...............9

    B.    TERMS OF THE PROPOSED SETTLEMENT .....................................11

        1.    The Settlement Class.....................................................................11

        2.    Relief to Class Members ................................................................11

            a.    Reimbursement to Settlement Class Members for Products Purchased ..........................................................................11

            b.    Service Awards and Attorneys' Fees and Costs .....................12

            c.    Class Notice and Settlement Administration Costs ...............12

            d.    Unredeemed Settlement Checks ............................................13

        3.    The Release....................................................................................13

        4.    Notice Plan.....................................................................................14

        5.    Procedures for Making Claims .......................................................15

        6.    Procedures for Opting Out and Objecting ......................................15

    C.    PRELIMINARY APPROVAL, NOTICE, AND SETTLEMENT ADMINISTRATION ..................................................................................16

        1.    Preliminary Approval Proceedings .................................................16

        2.    Notice ............................................................................................18

        3.    Claims Administration ...................................................................19

a.    Number of Claims and Claims Rate ......................................19

b.    Number of Settlement Class Members Who 'Opted Out' ....................20

c.    Number of Settlement Class Members Who Objected ..........................20

d.    Number of Settlement Class Members Who Commented
      on Settlement ........................................................................20

4.    Total Cash Consideration ........................................................22

ARGUMENT ................................................................................................22

I.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE............................22

A.    The Settlement is fair considering the strength of Plaintiffs' case and risks of
      continued litigation ...................................................................................23

1.    As the Court has repeatedly recognized, Plaintiffs face risks on the merits....24

2.    The Parties dispute the measure and amount of damages................................27

3.    Plaintiffs recognize that certification of a litigation class is uncertain ...........28

4.    Continued litigation would be time-consuming and expensive......................28

B.    The amount of the Settlement weighs in favor of approval......................................29

C.    The extent of discovery and stage of proceedings weigh in favor of approval ........33

D.    The experience and views of counsel weigh in favor of settlement ........................35

E.    The lack of a governmental participant at this stage is neutral................................35

F.    The reaction of the Class Members to the Settlement favors final approval ...........36

G.    Other Rule 23(e) Factors..........................................................................................36

1.    The methods for processing claims and distributing monetary relief are
      effective and adequate..........................................................................36

2.    The terms of the proposed award of attorneys' fees are fair............................37

3.    There are no Rule 23(e)(3) supplemental agreements to identify....................37

4.   Class Members are treated equitably relative to each other ............................38

II.   THE SETTLEMENT CLASS SHOULD REMAIN CERTIFIED ....................................39

III.   CONCLUSION......................................................................................................................39

## **TABLE OF AUTHORITIES**

**Cases**                                                                 ***Page***

*Ahmed v. HSBC Bank USA* (C.D. Cal. Jun. 21, 2019)
     2019 U.S. Dist. LEXIS 104401 ....................................................................38

*Akaosugi v. Benihana Nat. Corp.* (N.D. Cal. Jan. 24, 2013)
     2013 WL 269083 ..........................................................................................26

*Atkinson v. Minted, Inc.* (N.D. Cal. Dec. 17, 2021)
     2021 WL 6028374 ....................................................23, 28, 34, 35, 36

*Bezdek v. Vibram USA, Inc.* (1st Cir. 2015)
     809 F.3d 78 ....................................................................................................30

*Briseno v. Henderson* (9th Cir. 2021)
     998 F.3d 1014 ................................................................................................22

*Bristol-Myers Squibb Co. v. Superior Court* (2017)
     137 S. Ct. 1773..............................................................................................6

*Broomfield v. Craft Brew All., Inc.* (N.D. Cal. Feb. 5, 2020)
     2020 WL 1972505 ........................................................................................30

*Burgos v. Sunvalleytek Int'l, Inc.* (N.D. Cal. Dec. 11, 2020)
     2020 WL 7319354 ........................................................................................23

*Campbell v. Facebook, Inc.* (9th Cir. 2020)
     951 F.3d 1106 ................................................................................................22

*Carson v. Monsanto Co.* (S.D. Ga. 2020)
     508 F. Supp. 3d 1369 ....................................................................................26

*Clark v. Monsanto Co.* (Cal. Super. Ct., Los Angeles Cnty., Oct. 5, 2021)
     No. 20STCV46616 ........................................................................................24

*Custom LED, LLC v. eBay, Inc.* (N.D. Cal. June 24, 2014)
     2014 WL 2916871 ........................................................................................36

*Ezcurra v. Monsanto Co.* (S.D. Fla.)
     2020 WL 5491428 ............................................................................4, 5, 25

*Ezcurra v. Monsanto Co.* (11th Cir. Sept. 3, 2021)
     No. 20-13341-X ........................................................................................5, 7

*Ferrell v. Buckingham Prop. Mgmt.* (E.D. Cal. Jan. 21, 2020)
2020 WL 291042 ........................................................................................30

*Fulford v. Logitech, Inc.* (N.D. Cal. Mar. 5, 2010)
2010 U.S. Dist. LEXIS 29042 .....................................................................29

*Hanlon v. Chrysler Corp.* (9th Cir. 1998)
150 F.3d 1011 ............................................................................................39

*Hanna v. Walmart Inc.* (C.D. Cal. Nov. 4, 2020)
2020 WL 7345680 ...............................................................................5, 8, 25

*Hardeman v. Monsanto Co.* (9th Cir. 2021)
997 F.3d 941 ..............................................................................................25

*Harnish v. Widener Univ. Sch. of L.* (3d Cir. 2016)
833 F.3d 298 ..............................................................................................30

*In re Apple Inc. Device Performance Litig.* (N.D. Cal. Mar. 17, 2021)
2021 WL 1022867 ......................................................................................29

*In re Hyundai* (9th Cir. 2019)
926 F.3d 539 ..............................................................................................23

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.* (3d Cir. 2018)
903 F.3d 278 ................................................................................................6

*In re Lenovo Adware Litig.* (N.D. Cal. April 24, 2010).
2019 U.S. Dist. LEXIS 69797 .....................................................................39

*In re Lumber Liquidators Mktg. Sales Pracs. Litig.* (E.D. Va. Oct. 9, 2018)
2018 WL 11203065 ....................................................................................30

*In re Mego Fin. Corp. Sec. Litig.* (9th Cir. 2000)
213 F.3d 454 ..............................................................................................33

*In re Omnivision Techs., Inc.* (N.D. Cal. 2008)
559 F.Supp.2d 1036 ...................................................................................30

*In re Online DVD-Rental Antitrust Litig.* (9th Cir. 2015)
779 F.3d 934 .........................................................................................33, 39

*In re Pac. Enters. Sec. Litig.* (9th Cir.1995)
47 F.3d 373 ................................................................................................35

*In re Polyurethane Foam Antitrust Litig.* (N.D. Ohio 2016)
    168 F. Supp. 3d 985 ....................................................................................30

*In re POM Wonderful LLC* (C.D. Cal. Mar. 25, 2014)
    2014 WL 1225184 .......................................................................................31

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.* (E.D. La. July 27, 2015)
    2015 WL 4528880 .......................................................................................30

*In re TracFone Unlimited Serv. Plan Litig.* (N.D. Cal. 2015)
    112 F. Supp. 3d 993 ...............................................................................24, 33

*In re Volkswagen & Audi Warranty Extension Litig.* (D. Mass. 2011)
    273 F.R.D. 349 .......................................................................................33, 35

*Jones v. Monsanto Co.* (W.D. Mo. May 13, 2021)
    2021 WL 2426126 .......................................................................................33

*Kerr v. Vatterott Educ. Ctrs. Inc.* (Mo. Ct. App. 2014)
    439 S.W.3d 802 ..........................................................................................31

*Kim v. Allison* (9th Cir. 2021)
    8 F.4th 1170 ...............................................................................................22

*Koller v. Monsanto*
    3:22-cv-04260-VC .....................................................................................20

*Lane v. Facebook, Inc.* (9th Cir. 2012)
    696 F.3d 811 ..............................................................................................32

*Lilly v. Jamba Juice Co.* (N.D. Cal. May 4, 2015)
    2015 WL 2062858 .......................................................................................24

*Mazza v. Am. Honda Motor Co.* (9th Cir. 2012)
    666 F.3d 581 ..............................................................................................28

*McDonald v. CP OpCo, LLC* (N.D. Cal. May 13, 2019).
    2019 U.S. Dist. LEXIS 80501 ....................................................................29

*McDonough v. Toys R Us, Inc.* (E.D. Pa. 2015)
    80 F. Supp. 3d 626 .....................................................................................30

*Mirzaie v. Monsanto Co.* (C.D. Cal. Jan. 12, 2016)
    2016 WL 146421 ........................................................................................26

*Moore v. Verizon Comms. Inc.* (N.D. Cal. Aug. 28, 2013)
    2013 WL 4610764 ...................................................................................................32

*Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.* (N.D. Cal. May 5, 2021)
    2021 WL 1788447 ............................................................................................23, 26

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.* (C.D. Cal. 2004)
    221 F.R.D. 523 .........................................................................................................36

*Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco* (9th Cir. 1982)
    688 F.2d 615 ............................................................................................................27

*Ontiveros v. Zamora* (E.D. Cal. 2014)
    303 F.R.D. 356 .........................................................................................................33

*Palacios v. Penny Newman Grain, Inc.* (E.D. Cal. July 6, 2015)
    2015 WL 4078135 ....................................................................................................34

*Rael v. Children's Place, Inc.* (S.D. Cal. Jan. 28, 2020)
    2020 WL 434482 ......................................................................................................33

*Scoy v. Kasal* (Del. Super. Ct. Apr. 9, 1999)
    1999 WL 463552 ......................................................................................................30

*Stearns v. Ticketmaster Corp.* (9th Cir. 2011)
    655 F.3d 1013 ..........................................................................................................28

*Stephens v. Monsanto Co.* (Cal. Super. Ct., Alameda Cnty.)
    No. CIVSB2104801 ..................................................................................................24

*Taylor v. Costco Wholesale Corp.* (E.D. Cal. Oct. 8, 2020)
    2020 WL 5982090 ................................................................................................5, 25

*Tomlinson v. Monsanto* (Mo. Cir. Ct., Jackson Cnty. filed Aug. 19, 2019)
    No. 1916-CV22788.............................................................................16, 20, 27, 30, 31

*Toolajian v. Air Methods Corp.* (N.D. Cal. Apr. 24, 2020)
    2020 WL 8674094 ....................................................................................................30

*United States v. Oregon* (9th Cir. 1990)
    913 F.2d 576 ............................................................................................................29

*Walsh v. Al W. Chrysler, Inc.* (Mo. Ct. App. 2007)
    211 S.W.3d 673........................................................................................................31

*Weeks v. Home Depot U.S.A., Inc.* (C.D. Cal. Sept. 18, 2020)
　　2020 U.S. Dist. LEXIS 18836 ................................................................4, 8, 26

*Zepeda v. PayPal, Inc.* (N.D. Cal. Mar. 24, 2017)
　　2017 WL 1113293 ...............................................................................32

**Rules**

28 U.S.C. §1715 ..............................................................................................35

Fed. R. Civ. P. 23 ...........................................................................2, 6, 22, 32, 37, 39

Fla. Stat. § 501.212 .......................................................................................5, 26

## INTRODUCTION

After nearly two years of hard-fought litigation in numerous lawsuits over the allegedly misleading marketing of Roundup® weedkiller products against Monsanto Company ("Defendant") and retailers of the Products, the Parties reached this nationwide settlement resolving and releasing the claims asserted in eighteen cases brought in federal and state courts throughout the country. In the retailer cases, Plaintiffs sought to hold retailers of Roundup® accountable under state consumer protection statutes for promoting and knowingly placing a dangerous product in the stream of commerce without providing any warnings to consumers. This swath of cases all served as part of a broad and coordinated litigation strategy that ultimately brought Monsanto to the bargaining table. The Parties engaged in discovery and extensive briefing on an array of complex issues. The novel retailer cases placed significant financial and reputational pressure on Monsanto, and the strategy—executed through the hard work of Class Counsel and Plaintiffs' Counsel—was ultimately successful, leading to the proposed Settlement now before the Court.

The Settlement provides an excellent benefit to the Settlement Class. Under the terms of the Settlement, Monsanto agreed to pay total cash consideration in the amount of no less than $23 million (the "Floor") and no greater than $45 million (the "Ceiling"), used to pay Settlement Class Members who made valid claims, notice costs, claims administration expenses, incentive awards, and attorney's fees and expenses. As of the date of this filing, and assuming Plaintiffs' Motion for Fees, Costs, and Service Awards is granted, the cash consideration paid by Monsanto will be between $25,038,156 and $26,537,494, securely within the Settlement's Floor / Ceiling. Class Members who filed valid claims will receive two-thirds of Plaintiffs' estimate of best-case damages—and many times more than Monsanto's expert's estimate of damages—with the average payout per Class Member expected to be over $50.00 each.  If the Floor is not reached, Settlement Class Members who made valid claims will receive individual payments adjusted upward on a *pro rata* basis. Had the Ceiling been exceeded (it was not), then individual payments would be adjusted downward on a *pro rata* basis. *Id.* § D(2). Class Members will retain their right to sue if they

currently have or later develop cancer as a result of exposure to the Products. There is no injunctive relief component to the Settlement.

On June 22, 2021, after significant briefing (including objections to Plaintiffs' Motion for Preliminary Approval and responses thereto), a hearing, and due consideration, the Court granted preliminary approval of the Settlement, finding the settlement appeared to be fair, reasonable and adequate. Dkt. No. 121 (the "Order"). Nothing has changed that should affect the Court's ruling on final approval. The robust Notice Plan has been successful, Class Members will receive significant cash awards, and their reaction has been overwhelmingly positive.

Upon entry of the Order, the Claims Administrator began to implement the Notice Plan, and it has now been completed in accordance with the Order. As directed, Class Notice was provided through email, print advertisements, television, the Internet (including banner ads and online newsletters), and a press release. The deadline to make a claim or opt-out was October 19, 2022 and Class Members have until December 5, 2022 to file an objection.

The reaction of the Settlement Class has been overwhelmingly positive. They have submitted at least 226,268 valid claims, while only seven opt-outs have been received. With a week remaining to file objections, to date, none have been received except for the two objections raised at preliminary approval.

The Settlement provides an excellent benefit to the Settlement Class. Plaintiffs respectfully submit that the Settlement readily meets Federal Rule of Civil Procedure 23(e)'s requirements and the Ninth Circuit's standards for fairness, reasonableness, and adequacy. This Court should therefore grant final approval.

<u>**HISTORY OF THE LITIGATION**</u>

**A.    BACKGROUND**

This matter arises from Plaintiffs' allegations that Monsanto and/or various retailers engaged in misleading marketing, labeling, and/or sale of the Lawn and Garden herbicide Roundup®. *See generally,* Second Amended Complaint, Dkt. No. 22 ("SAC"). At issue was the

Products'[4] active ingredient glyphosate and its suspected carcinogenic properties. *Id.* ¶¶ 2-3, 7. The Plaintiffs all allege economic loss arising from the Products' misleading marketing and labeling due to alleged omissions regarding potential health risks, including the ongoing dispute as to whether they may cause cancer. *See id.* ¶ 6 ("Despite Monsanto's knowledge of Roundup®'s potential carcinogenicity, Monsanto has failed to convey this information to consumers in its promotion, marketing, advertising, distribution, labeling, and sale of Roundup®."); *see also id.* ¶¶ 161, 170.

In response, Monsanto and the retailer-defendants pointed to scientific studies and regulatory findings they contend show glyphosate is not carcinogenic and does not pose any unreasonable risks to human health. Therefore, they argued, cancer warnings on the Products are unwarranted and/or improper. Glyphosate's disputed carcinogenic quality aside, the defendants also asserted preemption defenses because the Products and their labels were registered by the U.S. Environmental Protection Agency. The retailer-defendants have further contended they are not responsible for Monsanto's disclosures one way or the other, and if Monsanto is not required to warn, then they cannot be required to warn.

### 1.    Litigation History

The Settlement proposes a nationwide resolution to numerous lawsuits over the allegedly misleading marketing of the Products against Monsanto and/or retailers of the Product. Settlement, Dkt. No. 94-1, Ex. 1 at 1, 2, 6, 21-22. Specifically, the Settlement resolves and releases the claims asserted in eighteen cases brought in federal and state courts throughout the country since July 2019. *Id.*

For purposes of brevity, this memorandum does not provide exhaustive procedural histories of each individual action, with Plaintiffs respectfully referring the Court to the chart attached at Appendix A to their Motion for Preliminary Approval, summarizing each case's procedural history. Dkt. No. 94 at App'x A. As explained herein, this swath of cases all served as part of a broad and

---

[4] The term "Products" are defined in Exhibit A of the Settlement.

coordinated litigation strategy aimed at holding not only Monsanto accountable for its conduct, but also holding the retailers that sell Monsanto's Roundup products accountable under state consumer protection statutes for actively promoting and knowingly placing dangerous products in the stream of commerce without providing any warnings to consumers. *See infra* § II(C). The most significant procedural developments are summarized below.

Class Counsel began filing retailer cases (the strategic significance of which is explained *infra*, § II(C)) in July 2019. One of those cases, filed against Home Depot, saw significant motions practice and discovery, including Home Depot's production of tens of thousands of pages of documents, the plaintiff's responses to written discovery, and many Rule 37 conferences. Wade Decl. ¶¶ 4[5]; *see also* Dkt. No. 94 at App'x A (summarizing *Weeks v. Home Depot*, No. 19-6780 (C.D. Cal. filed Aug. 5, 2019)).[6]

After filing a series of cases against retailers, Plaintiff's Counsel[7] in February 2020 filed *Ezcurra*. Originally filed in Florida state court and removed to the Southern District of Florida,

---

[5] References herein to "Wade Decl." refer to the declaration of Gillian Wade in Support of Final Approval filed concurrently herewith. Likewise, references to the "Schwartz Decl." refers to the declaration of Brandon Schwartz filed concurrently herewith. References to the "Wade MPA Decl." and "Oster MPA Decl." refer to the declarations submitted by Class Counsel in support of the Motion for Preliminary Approval, and the "Rosenthal MPA Decl." refers to the declaration submitted by defense counsel in support of preliminary approval. *See* ECF. Nos. 94-1, 94-2 and 94-3.

[6] Weeks prevailed on certain issues on Home Depot's second motion to dismiss. The court found the case was not expressly or impliedly preempted and that a retailer could be liable under California's Unfair Competition Law for knowingly selling a dangerous product without informing consumers of the dangers. *Weeks*, 2020 U.S. Dist. LEXIS 188369, at *5-21 (C.D. Cal. Sept. 18, 2020) (allowing Weeks to "conduct discovery with respect to the scope and extent of defendant's knowledge regarding the health risks to consumers posed by Roundup"). Although the case was later dismissed with prejudice on narrow Proposition 65 grounds, Weeks has filed his opening brief on appeal and the matter remains pending before the Ninth Circuit. Wade Decl. ¶ 5. Notably, *Weeks* is the *only* retailer case that was dismissed with prejudice, and all others were voluntarily dismissed only *after* a settlement was reached (or well before for strategic reasons). *See id.* at ¶ 6 (discussing cases).

[7] Southern Atlantic Law Group, PLLC filed the original complaint against Monsanto on behalf of Ezcurra in Florida state court. After the case was removed to federal court, MJFW was retained and appeared in the matter.

Ezcurra sought to represent a class of Florida Roundup® purchasers. Second Am. Compl., *Ezcurra v. Monsanto Co.*, No. 20-80524 (S.D. Fla. Dkt. No. 30) at ¶¶ 116-19. Monsanto moved to dismiss the initial complaint in April 2020. As part of their litigation strategy, in the leadup to Monsanto's brief deadline, Class Counsel filed additional cases against two retailers. *See* Dkt. No. 94 at App'x A (summarizing *Fagundes* and *Taylor*).

Monsanto's motion to dismiss in *Ezcurra* led to several amendments to the pleadings and months of motion practice. Wade MPA Decl. ¶ 5. With Monsanto's motion still pending, the Parties in May 2020 conducted a Rule 26(f) conference, filed a Joint Discovery Plan, and commenced discovery. *Id.* Additional retailer cases were filed soon thereafter. *See* Dkt. No. 94 at App'x A (summarizing *Hanna* and *Williams*).

The Parties in *Ezcurra* exchanged written discovery between May and July 2020. Monsanto responded to interrogatories, requests for admission, and requests for production, and it produced thousands of pages of documents, including sales data and final product labeling. Wade Decl. ¶ 7. Ezcurra responded to lengthy interrogatories and produced documents. *Id*. The Parties also served notices of deposition and began negotiating the scope of those depositions. *Id*. Expert discovery also began, the import of which is discussed below. *See infra* § II(D).

Shortly before Monsanto's expert disclosures were due, and with depositions set to commence,[8] the court granted Monsanto's motion to dismiss on the ground that Florida's safe-harbor provision[9] barred Ezcurra's claims (without addressing the merits of Monsanto's other arguments). *Ezcurra v. Monsanto Co.*, No. 20-80524, 2020 WL 5491428, at *1 & n.1, *66 (S.D. Fla. Aug. 7, 2020). An appeal followed, which was fully briefed but later stayed by the Eleventh

---

[8] *Ezcurra* was dismissed just one business day before depositions were scheduled to begin. Although the depositions never went forward, the parties were obviously prepared for them. Wade MPA Decl. at ¶ 9. Plaintiffs had also prepared a Motion for Class Certification that was due one week after the case was dismissed. Such preparation was necessary, given that trial was set for December 7, 2020.

[9] *See* Fla. Stat. § 501.212(1) (providing that the Florida Deceptive and Unfair Trade Practices Act does not apply to "any act or practice required or specifically permitted by federal law.")

Circuit pending approval proceedings in this action. *See* Order, *Ezcurra v. Monsanto Co.*, No. 20-13341-A (11th Cir. Sept. 3, 2021).[10]

The *Gilmore* action, which ultimately served as the vehicle for a nationwide settlement, was filed in August 2020. Mr. Gilmore sued only Monsanto—already under tremendous pressure from its retailer customers (*see infra* § II(C))—on behalf of himself and a putative class of "[a]ll persons who purchased at least one Product in the United States since August 19, 2017." ECF. No. 1 ¶ 111.[11] He alleged that Monsanto violated the Delaware Consumer Fraud Act ("DCFA") by promoting, marketing, advertising, distributing, labeling, and selling Roundup® Products without disclosing that they may cause cancer. *Id.* ¶¶ 131-32. Gilmore sought certification of a nationwide class under Rule 23(b). *Id.* ¶¶ 111, 139, 140, 142.

On December 3, 2020, Monsanto moved to dismiss Gilmore's initial Complaint on several bases. *See* Dkt. No. 10, 11. Among other things, Monsanto argued Gilmore's claim was foreclosed by *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283, 285 (3d Cir. 2018) (plaintiff must plead facts permitting a determination "that the economic benefit she received in purchasing the [product at issue] was worth less than the economic benefit for which she bargained"). *See* Dkt. No. 11 at 7-9. Gilmore responded by filing his First Amended Complaint on January 12, 2021. *See* Dkt. No. 14. Recognizing *Johnson & Johnson*, Gilmore alleged that he and the members of the putative class "paid a price premium for the [Roundup®] Product" and, "but for Defendant's omissions, the actual price Plaintiff and Class

---

[10] If the proposed Settlement is not approved, Ezcurra will move forward with his appeal. Wade MPA Decl. ¶ 9.

[11] Gilmore originally filed a complaint asserting a similar claim against Monsanto in the District of Oregon in July 2019 (Case No. 19-1123). While Gilmore did originally file in Oregon, his ultimate objective was to pursue nationwide class certification. Indeed, Delaware is a more suitable forum for purposes of certifying a nationwide class because Monsanto is incorporated there, and the Court has jurisdiction over non-resident class members' claims. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1783 (2017) ("out-of-state plaintiffs [not prevented] from joining together in a consolidated action in the States that have general jurisdiction over [defendant]"). If this strategy resulted in the Delaware District Court finding Gilmore could not proceed under the DCFA, he could and would have amended the complaint to assert claims under Oregon law.

Members paid would have, and should have, been less." Dkt. No. 14 ¶¶ 109, 110. Monsanto moved to dismiss the FAC on January 26, 2021, which was fully briefed by the Parties. ECF Nos. 15, 16.

### 2.    Plaintiffs' Multi-Faceted Litigation Strategy Brings Monsanto to the Table

This Action and the Related Actions did not exist in a vacuum. Rather, they were part and parcel of a coordinated litigation strategy not only to hold Monsanto accountable for its conduct, but also holding the retailers that sell Monsanto's Roundup products accountable under state consumer protection statutes for actively promoting and knowingly placing dangerous products in the stream of commerce without providing any warnings to consumers.

The novel cases against retailers had a significant impact on Settlement, placing financial and reputational pressure on Monsanto. *See, e.g.,* Rosenthal MPA Decl. at ¶ 4. In addition to responsibility for the retailers' defense costs, Monsanto faced significant legal exposure from the retailers, which could assert contractual and/or common-law indemnity claims against Monsanto should they be found liable. Rosenthal MPA Decl. at ¶ 4 (explaining, "the related actions also created significant monetary exposure for Monsanto, as it had obligations to indemnify each of the retailers named in these actions for defense costs and for any liability that the retailers may have incurred").

The strategy—executed through the hard work of Class Counsel and Plaintiffs' Counsel—was ultimately successful, leading to the proposed Settlement that now sits before the Court.

### 3.    Plaintiff Entered Mediation with a Wealth of Information

As the litigation history illustrates, the Parties—through discovery and extensive briefing on an array of complex issues—were well apprised of the strengths and weaknesses of the cases before engaging in settlement talks. Wade MPA Decl. ¶ 36; Wade Decl. ¶ 10. This was further underscored by briefing occurring during the time settlement discussions were underway,[12] creating further risks for both parties which facilitated settlement.

---

[12] Class Counsel continued prosecuting the Related Actions and appealed *Ezcurra* to the Eleventh Circuit. Wade Decl. ¶ 9. Although Class Counsel continue to believe the merits of the Related Actions were strong, Plaintiffs encountered several roadblocks after this case was filed.

Also key was the expert discovery in the *Ezcurra* case. Wade MPA Decl. ¶ 7. Class Counsel retained D.C. Sharp, Ph.D., an economic expert and formerly tenured Associate Professor of Economics and Business Advisory Council Research Professor at the University of Southern Mississippi. Wade MPA Decl. at ¶ 7, Ex. 2 ("Sharp Report") ¶¶ 4-5. Ezcurra produced the Sharp Report under Rule 26(a)(2), which measured class-wide damages under a price premium model. *Id*. Dr. Sharp prepared a hedonic-regression analysis estimating the impact of the alleged failure to warn of Roundup's cancer risk. *Id.* App. B. Dr. Sharp concluded that consumers had paid a price premium of 31% more than what they would have been willing to pay for a similar product that disclosed a carcinogenic active ingredient. *Id.* ¶¶ 28-31. Applied to Monsanto's estimated $2.66 billion in sales (*see* Rosenthal MPA Decl. ¶ 12), Class Counsel estimated its best-case damages at trial to be approximately $825 million.

Notably, Dr. Sharp's analysis was *not* prepared in support of this Settlement, but was submitted as part of Plaintiffs' expert disclosures in the *Ezcurra* action. In that adversarial posture, Plaintiffs had every incentive to calculate the maximum potential recovery. This further legitimizes Class Counsel's calculation of the 'best-case' recovery at trial of approximately $825 million, assisting the Court with its assessment of the Settlement. This is not a case where the parties arbitrarily agreed to a number for the purpose of negotiation.

Monsanto, meanwhile, had its own expert analysis. Applying market simulation analysis and survey data, Dr. Kristina Shampanier—who holds a Ph.D. in Business Management Science and Master's degrees in both Mathematics and Economics—"determined that there was no *statistically significant* price difference between a Roundup® product that does not include [a long or short warning statement that the Product contains a probable carcinogen] and one that does." Rosenthal MPA Decl., Ex. A at 8-12 at ¶¶ 2, 5, 11 (emphasis in original). According to Dr.

---

*Id*. Between September 2020 and January 2021, courts dismissed, with leave to amend, complaints in three Related Actions: *Weeks v. Home Depot*, *Taylor v. Costco*, and *Hanna v. Walmart*. *Id*. And, in December 2020, the court dismissed Weeks' claim with prejudice. Order Granting Def.'s Mot. to Dismiss Pltfs.' Second Am. Compl. (Dkt. No. 77), *Weeks v. Home Depot U.S.A., Inc.*, No. 2:19-cv-06780-JWH-AS (C.D. Cal. Dec. 16, 2020) ("*Weeks* Dismissal Order").

Shampanier's analysis, "the average estimated price premium (difference in price) for a Roundup® product that does not include the Long Warning Statement relative to a Roundup® product that includes the Long Warning Statement is 1.5%[.]" *Id.* ¶ 11.

There was therefore a risk that—even if Plaintiffs were to prevail on liability—the Class recovery may be a fraction of what Dr. Sharp had estimated.[13] As this Court observed, "there is a real risk that the plaintiffs would not be able to demonstrate that they are entitled to any damages as the 'price premium' calculation would be heavily contested." Order Granting Preliminary Approval, Dkt. No. 121 ("MPA Order"), at ¶ 5 (language added by Court).

The work done in the Related Cases—discovery, the expert analysis, and briefing on complex issues, including class certification—contributed significantly to the Settlement.[14] Wade Decl. ¶ 11.

### 4. Mediation and the Proposed Settlement Resolves All of the Actions

In February 2021, with Monsanto's motion to dismiss the *Gilmore* FAC still pending, the Parties mediated before former United State Magistrate Judge Diane M. Welsh.[15] Wade MPA Decl., Ex. 3 ("Welsh Decl.") at ¶ 6. Prior to mediation, Gilmore and Monsanto each separately prepared lengthy mediation statements, including hundreds of pages of exhibits, setting forth their respective views of the strengths and weaknesses of their cases on the merits, the likelihood of class certification, and estimates of damages should Plaintiffs succeed. Welsh Decl. ¶ 5-6. Both Parties also prepared confidential statements for Judge Welsh's eyes only. *Id.* To facilitate

---

[13] As explained in fn. 27, a 100% claims rate (assuming no Settlement cap was in place) would translate to $532 million in claims. This amounts to 64% of Class Members' recovery at trial if the jury accepted in full Dr. Sharp's analysis, and a whopping 1,230% of the Class Members' recovery under Dr. Shampier's analysis.

[14] Class Counsel was also informed by publicly available discovery from a number of personal injury cases in litigation. Wade Decl. ¶ 11.

[15] Counsel had previously designated Judge Welsh as a mediator in *Ezcurra* in May 2020 pursuant to the that court's local rules and Pretrial Scheduling Order and indicated that they anticipated the Parties would try to resolve all Related Actions in a mediation with Judge Welsh. *Ezcurra* Dkt. No. 25.

settlement discussions, Monsanto produced nationwide sales data for its Roundup® Products to Gilmore's counsel. Wade MPA Decl. ¶ 13. Dr. Sharp analyzed this data for purposes of mediation. *Id*. ¶ 14.

The mediation took place before Judge Welsh via videoconference on February 16, 2021. Welsh Decl. ¶ 6. Negotiations lasted more than *14 hours* and involved multiple rounds of shuttle diplomacy by Judge Welsh and face-to-face negotiations among counsel. *Id.* ¶¶ 6-8. Shortly after midnight, the Parties reached an agreement in principle. *Id.* ¶ 9. After further negotiations regarding the details of the agreement, the Parties executed the initial Settlement Agreement on June 10, 2021. *See* Dkt. No. 26-1. Wade MPA Decl. ¶ 18.

As explained above, it is beyond dispute that the parties were more than informed to engage in meaning settlement discussions. *See supra* § II(D); *see also* Welsh Decl. ¶¶ 5, 8 (mediator describing the Parties' extensive preparation for settlement discussions). There was significant risk for both parties, as informed by the Parties' dueling expert analyses and a number of pending rulings on fully briefed matters. Wade Decl. ¶ 12. In addition to the *Ezcurra* appeal, Plaintiffs amended and briefed the motion to dismiss in the *Gilmore* matter.[16] Thus, there was incentive for Monsanto to avoid motion to dismiss rulings in the retailer actions. *Id*. The efficiency at which the parties were capable of settlement inures to the benefit of the litigants, the putative class, and the Court.

This Settlement is the culmination of Plaintiffs' hard-fought coordinated litigation strategy pursued on multiple fronts which ultimately brought Monsanto to the negotiating table. At the time of mediation, the Parties were more than able to assess the risks of continued litigation, further underscoring the Settlement's validity. Wade Decl. ¶ 13; Wade MPA Decl. ¶ 35.

## B.    TERMS OF THE PROPOSED SETTLEMENT

---

[16] On June 10, 2021, Plaintiffs filed a Second Amended Complaint, which added seven additional named plaintiffs (each of whom was a plaintiff in one or more of the Related Actions) and asserted claims both under the DCFA and for breach of warranty. Dkt. No. 21-1.

### 1.    The Settlement Class

For purposes of the Settlement only, the Court granted the parties' request to conditionally certify the following Settlement Class: all persons in the United States who, during the Class Period,[17] purchased the Products in the United States for purposes other than for resale or distribution. Settlement §§ A(51), B(1), B(3)-(4). Excluded from the Settlement Class are (i) judicial officers and associated court staff assigned to this case, and their immediate family members; (ii) past and present (as of the Effective Date) officers, directors, and employees of Monsanto; and (iii) all Class Members who timely and properly exclude themselves from the Settlement Class in the manner approved by the Court and set forth in the Class Notice. *See id.* § A(51). "Products" is defined by reference to a list of Lawn & Garden glyphosate-containing products.[18] *Id.* § A(44).

### 2.    Relief to Class Members

Under the Settlement, Monsanto has agreed to pay total cash consideration in the amount of no less than $23 million (the "Floor") and no greater than $45 million (the "Ceiling"). Settlement § D. Cash consideration includes Settlement Class Member payments, notice costs, claims administration expenses, incentive awards, and attorney's fees and expenses. *Id*. § D(1). There is no injunctive relief component to the Settlement. If the Floor is not reached, Class Members who made valid claims will receive individual payments adjusted upward on a *pro rata* basis. *Id.* § D(3). Had the Ceiling been exceeded (it was not), then individual payments would be adjusted downward on a *pro rata* basis. *Id.* § D(2).

### a.    Reimbursement to Settlement Class Members for Products Purchased

Class Members were able to claim funds from the Settlement by submitting a simple Claim

---

[17] The Class Period is separately defined for each state or territory by reference to the applicable statute of limitations for false-advertising or breach-of-warranty claims (whichever is longer) in that state or territory (accounting for any potential tolling) in effect at the time the Parties reached agreement. Settlement § A.20 & Ex. B.

[18] The Products include certain Ace® and HDX® brand glyphosate products that were manufactured by Monsanto and sold by its agent.

Form to the Claims Administrator. Settlement §I. Recognizing that many consumers would not have receipts or would not wish to go through the effort of locating them, proof of purchase was not required to claim up to one Product for each year of the Class Period, except for the three largest and highest-priced concentrated Products, which required valid proof of purchase.[19] *Id.* § I(6). If a Class Member provided valid proof of purchase, he or she was able to claim an unlimited number of units purchased during the Class Period. *Id.* § I(7).

If the Ceiling Amount is sufficient after payments of all other amounts set out in the Agreement (and it appears that it will be), Monsanto will pay Authorized Claimants approximately 20% of the average retail price for each Product claimed, rounded to the nearest 50 cents. *Id.* § E(1). Depending on the Product purchased, this will amount to be between $0.50 and $33.00 per unit. *Id.* The anticipated average payment per claimant is between $56.17 and $61.75.[20] Schwartz Decl. ¶ 34.

### b.    Service Awards and Attorneys' Fees and Costs

Regarding incentive awards and attorney's fees, Monsanto agreed not to contest a total of $40,000 ($5,000 for each named plaintiff) in requested incentive awards or Class Counsel's request for attorney's fees not exceeding $11.25 million (25% of the $45 million ceiling). *Id.* § F(1). Whether to award the requested service awards and attorneys' fees is in the Court's discretion and does not impact the validity of the Settlement. *Id.* Class Counsel's litigation expenses, if approved by the Court, will also be paid by Monsanto. *Id.* As detailed in Section I(G)(2) below, Plaintiffs filed their Motion for Attorneys' Fees, Costs, and Incentive Awards on October 31, 2022. Dkt. No. 122.

---

[19] For example, a Class Member who purchased a 1.33-gallon Roundup® Ready-to-Use Max Control 365 in California each year since 2015 could claim $49.00 total without proof of purchase.

[20] As noted, the actual value will depend on the Claims Administrator's review of certain claims yet to be reviewed and deficient claims. *See supra* n. 3.

### c.    Class Notice and Settlement Administration Costs

The costs of Class Notice and Settlement Administration is currently estimated to be approximately $826,962.00, which is consistent with the estimates provided at the preliminary approval stage. *Compare* Dkt. No. 94-4 ¶ 13 (estimating notice and administration costs would not exceed $1.24 million) *with* Schwartz Decl. ¶ 41 (current estimates).

### d.    Unredeemed Settlement Checks

The Settlement Agreement also includes a detailed provision for the disposition of funds in unclaimed, uncashed, or otherwise unredeemed checks.[21] Settlement §§ E.4-5. In short, under no circumstances will the total cash consideration be less than the Floor Amount. To the extent that unclaimed, uncashed, or otherwise unredeemed checks would cause the total cash consideration to fall below the Floor Amount, those amounts will be distributed to Class Members pro rata unless the amounts are so low that such distributions are not economically feasible, in which case they will be donated to the National Consumer Law Center ("NCLC"). *Id*.

### 3.    The Release

Under the Settlement, Class Members will release Monsanto, Retailers of the Products, and Related Parties from Claims—with the express exception of Personal Injury Claims and Medical Monitoring Claims[22]—arising from the facts alleged in the complaint, *i.e.*, from allegedly false, misleading, incomplete, or inaccurate statements or omissions regarding the alleged health effects of the Roundup® Products, as more fully specified in the Agreement and the Notice Documents. *Id*. § L(1)-(3); Schwartz Decl. ¶ 22, Ex. I at pages 18-21 (Appendix 2 to Long Form Notice [Release of Claims]). Personal Injury Claims and Medical Monitoring Claims are defined, respectively and in relevant part, as "Claims that assert a right to recover damages for the actual

---

[21] Class Members who submit claims via the online Claim Form portal on the Settlement Website have options for receiving payments via check or electronically, such as by PayPal. Schwartz Decl. ¶ 30. Notably, 194,158 Class Members chose to receive their settlement funds via electronic means, reducing the likelihood of uncashed, unclaimed or otherwise unredeemed checks. *Id*.

[22] Plaintiffs understand that other pending class actions assert medical-monitoring claims and that Monsanto contests those claims.

physical injury or illness … [or] compensatory, punitive, or exemplary damages, or attorney's fees, allegedly resulting or arising from the actual physical injury or illness" and "Claims that seek to require, or recover damages amounting to the costs of, medical monitoring or screening for potential physical injury or illness of a natural person." *Id.* §§ A(32), A(41), L(1); Schwartz Decl. Ex. I at pages 19-20.

The Notice documents made clear that Settlement Class Members would not be releasing personal injury claims and that they will retain their right to sue if they currently have, or later develop, cancer or any other illness or injury from exposure to the Products, incorporating the language for this purpose recommended by the Court at the preliminary-approval stage. *See, e.g.,* Schwartz Decl. ¶¶ 22, Ex. I (long form notice), Ex. C (online banner advertisements).

### 4.    Notice Plan

Postlethwaite & Netterville ("P&N") is the court-appointed Claims Administrator. *Id.* § G. P&N executed the Notice Plan agreed to by the Parties and approved by the Court; answered written inquiries from Class Members and/or forwarded those inquiries to Class Counsel as appropriate; received and maintained opt-out forms; established a Settlement Website and toll-free informational telephone number; received and processed Claims Forms; and otherwise assisted with settlement administration. *Id.* Upon final approval of the Settlement (and the expiration and/or rejection of any appeals), P&N will issue payments to Approved Claimants.

P&N, a highly experienced settlement administrator, designed an extensive Notice Program, a detailed description of which was included in the declaration of P&N's Director of Notice, Brandon Schwartz, filed at the time of preliminary approval (the "Schwartz MPA Decl."). Dkt. No. 94-4, ¶¶ 1-5, 18-48. The robust Notice Plan disseminated notice by a combination of the following, some in both English and Spanish: (1) direct notice via email to millions of likely purchasers, (2) print media (Publication Notice in Better Homes & Gardens), (3) online display, (4) social media, (5) online video, (6) television advertising, (7) digital newsletter publications of *Family Handyman, Better Home & Garden, Southern Living, Golf Magazine*, and *Kiplinger*, (8) search advertising, (9) third-party class action website and its opt-in digital newsletter, (10) a

national press release, (11) a toll-free settlement hotline dedicated to the Settlement, and (12) a Settlement Website that posts notices, FAQs, Claim Forms, relevant Court Documents, and contains a portal for making an online Claim. Schwartz Decl. ¶¶ 7-26. A dedicated email address was also established to provide email support so Class Members could address questions and requests to the Claims Administrator. *Id*.

### 5. Procedures for Making Claims

Settlement Class Members seeking relief under the Settlement were required only to submit a relatively simple Claim Form, which was available in both English and Spanish. Settlement § I, Schwartz Decl. ¶ 22, Ex. I. Settlement Class Members had the option of making a claim online or by printing the Claim Form from the Settlement Website and sending it to the Claims Administrator. *Id.* ¶ 30. They also could request that a Claim Form be mailed to them. *Id*.

The straightforward Claim Form required Class Members to provide only their contact information, the address where the Products were primarily used, information about their purchase history for the Products using product codes, and certification of the truthfulness of the information contained in the Claim Form. *Id*. § I(4); Schwartz Decl. ¶ 30, Ex. I. The "paper" Claim Form attached a list of Product Codes containing color sample images of the various products alongside the corresponding codes was attached to the Claim Form to help claimants recall which Products they purchased. Schwartz Decl. ¶ 30, Ex. I. The Claim Form also attached an easy-to-read chart listing the eligible purchase periods and proof of purchase requirements for each state. *Id*. Making claims online was a streamlined process, as Class Members had easy access to the same color product images and purchase period information, and could select which Products were purchased and provide the required information using a drop-down menu. *Id*. The deadline to make a claim was October 19, 2022.

### 6. Procedures for Opting Out and Objecting

Class Members who wished to opt out of the Settlement were able to submit an Opt-Out Form available on the Settlement Website or through a request to the Settlement Administrator by

October 19, 2022. Settlement § J. The process to opt out was simple and involved completing, signing, and submitting a basic form. *Id.*

Class Members who wish to object must file and serve a written objection by December 5, 2022, using the procedure set forth in the Agreement and described in the Long Form Class Notice and on the Settlement Website.[23] *Id.* § K; PA Order ¶ 15. Class Members could make a claim even if they objected or plan to object. Except for the objections to preliminary approval that this Court has already considered and overruled, no objections have yet been filed.

## C.    PRELIMINARY APPROVAL, NOTICE, AND SETTLEMENT ADMINISTRATION

### 1.    Preliminary Approval Proceedings

Plaintiffs filed their Motion for Preliminary Approval (Dkt. No. 94) ("MPA") on January 20, 2022.  Two groups of objectors opposed.  First, two of the plaintiffs in the *Tomlinson* action objected on various grounds, including that (1) there were supposedly signs of "collusion" and "reverse auction"; (2) the proposed settlement relief was allegedly inadequate; (3) Class Members were allegedly not treated equitably relative to each other; and (4) the release was allegedly overbroad.  Dkt. No. 106.  Second, objectors Leonard, Cervantes, and Godsey argued that the Settlement's release was overbroad and that there were "red flags" of collusion.  Dkt. No. 105. Plaintiffs and Monsanto separately filed responses to both sets of objections, each explaining that the allegations of collusion and "reverse auction" were unfounded and that the Settlement and its release were fair and adequate and did not release any personal-injury or medical monitoring claims.  Dkt. Nos. 108-110.

The Court held a preliminary approval hearing on April 13, 2022.  Each of the Parties and counsel for both sets of objectors presented argument.  On April 20, 2022, the Court issued an order stating that it was "inclined to preliminarily approve the proposed settlement" subject to the

---

[23] In accordance with this Court's Standing Order, the notices submitted herewith make clear that the Court will require only substantial compliance with the requirement of a written objection and that compliance may be excused upon a showing of good cause.

Parties agreeing to acceptable changes to the proposed class notices to "clearly inform potential class members that, if they participate in the settlement, they will retain the right to sue Monsanto based on any illness or injury they may suffer now or in the future as a result of using Roundup." Dkt. No. 117. The Parties submitted proposed language in this regard on May 17, 2022. Dkt. No. 118. The Court then issued an order on May 19, 2022, proposing simplified language, "Class members will retain their right to sue if they currently have or later develop, cancer or any other illness or injury from exposure to the products." Dkt. No. 119. Four days later, the Parties filed a joint response agreeing to this proposed language and agreeing to include it in a conspicuous location in the class notices, settlement website, and on the claim form. Dkt. No. 120.[24]

On June 21, 2022, the court issued an order preliminarily approving the Settlement. PA Order. The Court stated its assessment of the Settlement was "as rigorous as at the final approval stage," and it found that the Settlement was "fair, reasonable, and adequate and merits preliminary approval." PA Order ¶ 2. The Court addressed and rejected the objectors' contention that there were signs of "collusion" and that the release was overbroad. *Id.* ¶¶ 3, 6. Indeed, the Court added language to the proposed preliminary approval order, stating: "Specifically, there is no evidence of a 'reverse auction' between the plaintiffs and Monsanto. The existence of parallel litigation brought by other firms, without more, is not enough to raise concerns that the parties entered into this settlement in bad faith or that the plaintiffs in the other cases could have obtained a more generous settlement." *Id.* ¶¶ 3. The Court also found (again, adding its own language to the proposed order) that the settlement amount was fair and the "floor/ceiling settlement structure [was] reasonable," observing:

> The settlement amount and compensation rates appear to be adequate given the many risks inherent in this litigation. Were this litigation to proceed, Monsanto would have colorable defenses available to it (such as preemption) that may wholly absolve it of liability. Additionally, there is a real risk that the plaintiffs would not

---

[24] Confusingly, the *Godsey* objectors filed a motion for attorneys' fees on grounds their objection to the scope of the release resulted in this language being added to the Class Notice documents. *See* Dkt. No. 123. But it was the Court—not the *Godsey* objectors—who proposed and caused this language to be added to the Class Notice.

> be able to demonstrate that they are entitled to any damages as the
> "price premium" calculation would be heavily contested.

*Id*. ¶¶ 4, 5 (language added by the Court).

### 2.    Notice

Following preliminary approval, the parties and Court-appointed Claims Administrator, P&N, carried out their duties in connection with Class Notice and the administration of the Settlement as set forth in the Agreement. This included a successful 100-day notice period and 120 days to submit claims (the "Class Deadline").  *See* Schwartz Decl. ¶ 4; PA Order ¶ 21.

Notice was implemented consistent with the court-approved notice plan.  Schwartz Decl. ¶ 4. P&N (1) caused the Publication Notice to be published in the September 2022 (on-sale August 12, 2022) edition of *Better Homes & Gardens*; (2) caused digital banner notices to run across Google, Yahoo! and Centro Ad Networks, Facebook, Instagram, Pinterest, Outbrain and video notice on YouTube; (3) disseminated notice through the digital newsletter publications of *Family Handyman*, *Better Homes & Gardens*, *Southern Living*, *Golf Magazine*, and *Kiplinger*; (4) caused a 30-second English language television notice on connected TV devices; (5) caused notice to appear by sponsored search advertising via Google Ads; (6) placed notices with Top Class Actions, (www.topclassactions.com) and ClassAction.org (www.classaction.org); (7) disseminated notice to a purchased list of approximately 3,500,000 email addresses of individuals that have an interest in lawn and garden maintenance; and (8) disseminated a nationwide news release over Cision's PR Newswire US1 & National Hispanic newslines in English and Spanish announcing the Settlement. *Id.* ¶ 7-20.

In total, the Notice Plan as described delivered an 81% reach with an average frequency of 2.60. *Id.* ¶ 28; *compare with* Schwartz MPA Decl. ¶ 18 (Notice Plan estimated to have reached at least 80% of the Settlement Class, with Class Members being exposed to notice, on average, 2.52 times). The measurable reach of the Notice Plan does not include CTV, email notice, search advertising, third-party class action websites, Settlement Website, toll-free hotline, and press

release, as these media vehicles are difficult to calculate. Schwartz Decl. ¶ 28. They, however, meaningfully strengthened the reach and frequency of the Notice Plan. *Id.*

Anticipated administration and notice costs were also consistent with the estimates provided at the preliminary approval stage. *Compare* Dkt. No. 94-4 ¶ 13 (estimating notice and administration costs would not exceed $1.24 million) *with* Schwartz Decl. ¶ 41 (anticipated notice and administration costs are approximately$ 826,962.00).

### 3.    Claims Administration

In accordance with this District's Guidance, Plaintiffs provide information regarding "the number of class members who submitted valid claims, the number of class members who opted out, and the number of class members who objected to or commented on the settlement." Northern District of California, *Procedural Guidance for Class Action Settlements* ("Guidance"), at Final Approval ¶ 1.[25]

### a.    Number of Claims and Claims Rate

As of November 28, 2022, the Claims Administrator had received 247,099 net claims,[26] and estimates the net valid claims to range between 226,268 and 230,097. Schwartz Decl. ¶ 32. The value of net valid claims ranges from $12,710,305.50 on the low end to $14,209,643.50 on

---

[25] The Guidance also requires information "about the number of undeliverable class notices and claim packets[.]" *Id.* Presumably, this contemplates a settlement where, unlike here, the identity of the Class Members is known. Even though notice was accomplished primarily through publication in this case, the Claims Administrator "disseminated notice to a purchased list of approximately 3,500,000 email addresses of individuals that have an interest in lawn and garden maintenance… Prior to sending, emails were put through a hygiene and verification process to protect the integrity of the email campaign and maximize deliverability… Ultimately, the email notice was successfully delivered to 2,845,608 email addresses." Schwarz Decl. ¶¶ 16-18.

[26] Net claims represent claims received after the removal of suspected fraud and/or claims with indication of automated submission. The Claims Administrator exercised industry-accepted practices and processes to identify, investigate and validate and/or reject potentially fraudulent claims, including safeguards to ensure that Claims that had indications of automation were submitted by real persons, Internet Protocol Address validation, as well as email and digital payment verifications.  Schwartz Decl. ¶ 31, n.3. Class Counsel was actively involved in discussions with the Claims Administrator to ensure that the claims process was not burdensome for Class Members. Wade Decl. ¶ 15.

the high end. *Id.* A range is provided at this time because the Claims Administrator continues to review claims, and because 3,829 claimants (of the 230,097) were given the opportunity to cure certain deficiencies. *Id.* ¶ 33. Based on these claims numbers, Plaintiffs estimate a claims rate of between 2.39 and 2.67 percent.[27]

Notably, the estimated average payment per individual Class Member will be between $56.17 and $61.75 (pending further review by the Claims Administrator). This further confirms the robustness of the recovery and incentive for Class Members to participate in the Settlement.

### b.    Number of  Settlement Class Members Who 'Opted Out'

Only seven Class Members opted out of the Settlement—five of whom are represented by the same Counsel, and four of those five are named plaintiffs in another action in the MDL pending before this Court, *Koller v. Monsanto*, 3:22-cv-04260-VC. *See* Schwartz Decl. ¶ 39.

### c.    Number of Settlement Class Members Who Objected

As of the date of this filing, no objections other than the two objections to preliminary approval filed by the *Tomlinson* and *Godsey* plaintiffs have been received. These objections were fully considered and overruled at the preliminary approval stage. *See* Dkt. Nos. 105 and 106; PA Order.

### d.    Number of Settlement Class Members Who Commented on Settlement

The Claims Administrator did not receive any comments from Class Members regarding the substance of the Settlement. Schwartz Decl. ¶ 40.

Relatedly, as explained in Class Counsel's November 14, 2022 letter to the Court (Dkt. 124), one individual (who stated he is *not* a Class Member but was attempting to help a family member who is) reached out to Class Counsel and the Claims Administrator to complain that he was unable to access the online Claim Form at 10:37 p.m. pacific time on the last day to make

---

[27] This can be calculated based on the estimated $2.66 billion of sales of the Products during the Class Period.  See Wade Decl. ¶ 14; *see also* Rosenthal MPA Decl. ¶ 12.  Since the Settlement provides for cash payments of 20 percent of average retail price, a 100 percent claims rate would amount to 20 percent of sales, or $532 million, of which the low and high end of estimated valid claims comprises 2.39 and 2.67 percent, respectively.

claims. *See* Dkt. No. 124. This was because the Claim Form closed at midnight central time, where P&N's servers are located, and thus the Claim Form was not accessible online after 10:00 pm pacific time on October 19, 2022. *Id.* Another person submitted a paper claim postmarked the date after the claims period closed that noted they were unable to submit an online claim the previous evening.[28] *Id.* To date, other than the communications with these two individuals, Class Counsel has received no further correspondence regarding the closure. Wade Decl. ¶ 16.

To address the inaccessibility of the Claim Form after 10:00 pm Pacific Time on October 19, 2022, Class Counsel and the Claims Administrator took the actions described in the November 14 letter. Dkt No. 124. *See also* Schwartz Decl. ¶¶ 35-38; Wade Decl. ¶ 16. Specifically, as outlined in the letter, the Claims Administrator has notified approximately 462 persons they were able to electronically identify as starting a claim in the hours before the portal closed and did not complete the claims process. Schwartz Decl. ¶ 35. The Claims Administrator has also contacted 519 persons who sent in paper Claim Forms postmarked within one week of the closing of the Claims Period to determine whether the tardiness is related to the closure of the Claim Form portal. *Id*. ¶ 37.

Additionally, the Claims Administrator posted the following information about the closure on the Settlement Website's landing page and Claim Form page: "On October 19, 2022, the Claim Form was inaccessible from 10:00 p.m. Pacific Time until midnight. If you attempted to access the Claim Form in this timeframe and wish to make a claim, please click HERE." *Id*. ¶ 36. Upon clicking on the link, Settlement Class Members were able to provide their name and email address and click an attestation box to receive a link to the online Claim Form. *Id*. As of November 25, 2022, the Claims Administrator has received 443 submissions with a request to make a Claim and 157 completed Claim submissions, which remain under review. *Id*.

---

[28] That claim will be processed by the Claims Administrator as if timely. *Id.*

4.      **Total Cash Consideration**

As of the date of this filing, and assuming Plaintiffs' Motion for Fees, Costs, and Service Awards is granted, the cash consideration paid by Monsanto will be between $25,038,156 and $26,537,494, securely within the Settlement's $23-45 million Floor / Ceiling. The current amounts comprising the cash consideration are between approximately $12,710,306 and $14,209,644 (payments to Class Members), $446,449 (notice costs), $380,513 (anticipated claims administration costs), $40,000 (requested incentive awards), $11.25 million (requested attorney's fees), and $210,888 (requested litigation expenses). Schwartz Decl. ¶ 41.

**ARGUMENT**

I.      <u>**THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**</u>

Rule 23(e)(2) permits a court to approve a Rule 23(b)(3) class settlement upon a finding that the settlement is "fair, reasonable, and adequate."[29] To assess this, the Ninth Circuit considers eight non-exhaustive "*Churchill*" factors":

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *Hanlon*, 150 F.3d at 1026) (alterations in original) (quotation marks omitted); *see also Kim v. Allison*, 8 F.4th 1170,

---

[29] Although the rule was amended in 2018 to identify the certain criteria to guide district courts, those criteria were not intended to displace the factors traditionally used by circuit courts. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 & n.10 (9th Cir. 2020). Objectors Leonard, Cervantes, and Godsey argued in their opposition to preliminary approval that the *Churchill* factors failed to consider the additional Rule 23(e) factors of "analyzing the 'terms of the settlement' and 'terms of any proposed award of attorney's fees'" Dkt. 105 at 5-6 (citing *Briseno v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021)). Although, "[t]he Ninth Circuit has repeatedly relied on the Churchill factors to guide its analysis in cases post-dating the 2018 amendments to Rule 23(e), as have courts in this district," Dkt. 110 at 2 (citing cases), this motion will address the additional Rule 23(e) factors concerning the terms of the settlement, and the terms of the proposed award of attorney's fees. Plaintiffs further respectfully refer the Court to their separate motion for fees. *See* Dkt. 122.

1178 (9th Cir. 2021); *Atkinson v. Minted, Inc.*, 2021 WL 6028374 (N.D. Cal. Dec. 17, 2021) (Chhabria, J.) (applying the *Churchhill* factors and granting final approval of settlement). Ultimately, a court's goal in reviewing a class settlement is to "ensure[] that unnamed class members are protected 'from unjust or unfair settlements affecting their rights.'" *Campbell*, 951 F.3d at 1121 (quoting *Hyundai*, 926 F.3d at 556, 568) (alteration in original). With that said, the Court's analysis must reflect "the 'strong judicial policy that favors settlement'" in complex class litigation. *Id.* (citations omitted).

This Court has already applied the rigorous scrutiny that most courts reserve for the final approval stage and found that the Settlement is fair, reasonable, and adequate. PA Order ¶ 2. Results of the notice and claims process confirm this. Without releasing any claims for personal injury or medical monitoring, the Settlement will provide Class Members with direct cash payments of approximately *two-thirds* of their estimated best-case damages were they to succeed at trial. Given the fact-intensive nature of Plaintiffs' claims, Monsanto's and retailers' success in several Related Actions, and the other risks, costs, and uncertainties of litigating those claims on a class wide basis through trial, the Settlement is an excellent result for the Settlement Class and should receive final approval.

A.    **The Settlement is fair considering the strength of Plaintiffs' case and risks of continued litigation.**

The first three *Churchill* factors are often "addressed together and require the court to assess the plaintiff's likelihood of success on the merits and the range of possible recovery versus the risks of continued litigation and maintaining class action status through the duration of the trial." *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*, 2021 WL 1788447, at *5 (N.D. Cal. May 5, 2021) (citations omitted). "Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case" or face other "difficulties and risks in litigating" their claims. *Burgos v. Sunvalleytek Int'l, Inc.*, 2020 WL 7319354, at *6 (N.D. Cal. Dec. 11, 2020). The first three "factors weigh in favor of approving the settlement when the defendant has 'plausible defenses that could have ultimately left class members with a reduced or non-

existent recovery.'" *Moreno*, 2021 WL 1788447, at *5 (quoting *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 999 (N.D. Cal. 2015)).

### 1.    As the Court has repeatedly recognized, Plaintiffs face risks on the merits.

First, although Plaintiffs believe in their claims, they recognize that success on the merits is not guaranteed. Courts in this district "routinely recognize that 'fact-intensive inquiries and developing case law present significant risks to Plaintiffs' claims and potential recovery.'" *Burgos*, 2020 WL 7319354, at *6 (quoting *Lilly v. Jamba Juice Co.*, 2015 WL 2062858, at *3 (N.D. Cal. May 4, 2015)).

Plaintiffs allege that Monsanto violated the Delaware Consumer Fraud Act (DCFA) by promoting, labelling, marketing, advertising and selling the Products without disclosing the Products' potential to cause cancer, on the label or in any other manner. *See, e.g.*, SAC ¶¶ 8, 148-63. As the Court knows, Monsanto disputes those allegations. And while Plaintiffs believe the evidence favors their position, and three plaintiffs have had success at trials on this issue in the failure to warn context, this issue is not without significant risk and remains in dispute, both in the Courts and in the scientific literature. Monsanto has now obtained six defense verdicts in a row in separate personal-injury cases alleging that Roundup® products caused cancer.[30] As this Court has previously recognized, it is "a very close question" whether the scientific evidence that glyphosate causes cancer passes the *Daubert* standard, and that the evidence is "too equivocal to support any firm conclusion that glyphosate causes NHL." Pretrial Order No. 45, Dkt. No. 1596, *In re*

---

[30] *See* Verdict Form, *Clark v. Monsanto Co.*, No. 20STCV46616 (Cal. Super. Ct., Los Angeles Cnty., Oct. 5, 2021) (finding that the plaintiff's exposure to Roundup® was not a substantial factor in causing his cancer); Verdict Form, *Stephens v. Monsanto Co.*, No. CIVSB2104801 (Cal. Super. Ct., Alameda Cnty.) (finding, in part, Monsanto was not negligent in designing Roundup® and did not know or should not have known Roundup® was dangerous); Law360, *Bayer Notches 3rd Roundup Trial Win With Missouri Verdict* (June 10, 2022), available at: https://www.law360.com/articles/1501501/bayer-notches-3rd-roundup-trial-win-with-missouri-verdict.; Law360, *Bayer Notches 4th Trial Win Over Roundup Weedkiller* (June 17, 2022), available at: https://www.law360.com/articles/1504211/bayer-notches-4th-trial-win-over-roundup-weedkiller.; Law360, Monsanto Gets Fast Win In St. Louis Roundup Trial (Sept. 1, 2022), available at: https://www.law360.com/articles/1526852/monsanto-gets-fast-win-in-st-louis-roundup-trial.

*Roundup*, MDL No. 2741. Additionally, as a practical matter, Plaintiffs acknowledge that, unlike the personal-injury plaintiffs, they are not contending Roundup® caused them to develop cancer and only seek recovery based on the purchase price of the Products. In short, it is clear to Plaintiffs that whether Roundup® does or can cause cancer remains a contested and controversial issue, which complicates the merits of the claims they are bringing here.

Monsanto and retailers have also had success on motions to dismiss in Related Actions.[31] Although Plaintiffs disagree with the decision and have filed their opening brief on appeal, the dismissal in *Weeks* is illustrative of the challenges presented in continued litigation. There, the court dismissed a Related Action after finding Plaintiff Weeks' theory, premised on Home Depot's alleged unfair conduct in selling Roundup® without informing consumers of the formulation's potential carcinogenicity, lacked "scientific support" and "stretches the limit of what constitutes unfair business dealings" under California's Unfair Competition Law ("UCL"). *Weeks* Dismissal Order at 7, 8. Plaintiffs also recognize Monsanto would continue to defend itself by arguing its labeling is accurate and taking the position that it would be deceptive to include any kind of warning regarding a cancer risk because EPA has approved product labels without cancer warnings, while repeatedly concluding the Products do not pose any unreasonable risks to human health.[32] Plaintiffs obviously disagree with EPA's conclusions and the weight Monsanto places on them, but acknowledge these facts present legal and factual challenges that are not guaranteed to be decided in their favor.

Plaintiffs understand that Monsanto would also raise other defenses argued in Related Actions. In *Ezcurra*, for example, the district court dismissed very similar claims under the Florida

---

[31] *See Weeks* Dismissal Order; *Hanna v. Walmart Inc.*, 2020 WL 7345680 (C.D. Cal. Nov. 4, 2020); *Taylor v. Costco Wholesale Corp.*, 2020 WL 5982090 (E.D. Cal. Oct. 8, 2020); *Ezcurra v. Monsanto Co.*, 2020 WL 5491428 (S.D. Fla. Aug. 7, 2020).

[32] *See, e.g.*, Dkt. No. 12-1, Ex. F (August 2019 letter from EPA to glyphosate registrants concluding that, "[g]iven EPA's determination that glyphosate is 'not likely to be carcinogenic to humans,' EPA considers [California's] Proposition 65 warning based on the chemical glyphosate to constitute a false and misleading statement").

Deceptive and Unfair Trade Practices Act's ("FDUTPA") safe harbor provision that bars FDUTPA claims when the alleged conduct is "[a]n act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1); *Ezcurra*, 2020 WL 5491428, at *2-5. Many other states similarly exempt acts or practices that are regulated by federal or state law from their consumer protection and unfair or deceptive trade practices laws (*see* Dee Pridgen et al., Consumer Protection and the Law § 4:32 (2020-2021)), and Monsanto would likely rely on those safe-harbor provisions if Plaintiffs asserted claims under other states' consumer-fraud laws. Courts in Related Actions have also held (albeit with leave to amend) that nearly identical UCL claims brought against retailers were barred by California Proposition 65's pre-suit notice requirements. *Hanna*, 2020 WL 7345680, at *3; *Weeks v. Home Depot U.S.A., Inc.*, 2020 WL 5947811, at *8 (C.D. Cal. Sept. 18, 2020).

Finally, as this Court recognized in granting preliminary approval, "[w]ere this litigation to proceed, Monsanto would have colorable defenses available to it (such as preemption) that may wholly absolve it of liability." PA Order ¶ 5 (language added by the Court). Though Monsanto has lost on FIFRA preemption several times, Monsanto has succeeded in some other cases involving Roundup® product labeling and advertising. *See, e.g.*, *Mirzaie v. Monsanto Co.*, 2016 WL 146421, at *2 (C.D. Cal. Jan. 12, 2016). The Ninth Circuit affirmed this Court's ruling that a personal injury plaintiff's failure-to-warn claims were not preempted by FIFRA to the extent they seek monetary damages, but as this Court noted in that ruling, Plaintiffs likely could not obtain the injunctive relief they seek. *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021); *Hardeman v. Monsanto*, 216 F. Supp. 3d 1037, 1037-38 (N.D. Cal. 2016). And even as to damages, Monsanto continues to assert preemption defenses in other jurisdictions—including before the transferor court in this action (*see* Dkt. No. 16 at 17-24) and before the Eleventh Circuit (*see Carson v. Monsanto Co.*, No. 21-10994 (11th Cir. Mar. 26, 2021)). If a circuit split emerges and Monsanto obtains a favorable decision from the Supreme Court, it could eliminate Plaintiffs' claims entirely. That risk weighs in favor of approval. *See, e.g.*, *Moreno*, 2021 WL 1788447, at *5 (holding that preemption defense supported approval where courts had "taken somewhat divergent approaches

26

in applying" defense in other cases); *Akaosugi v. Benihana Nat. Corp.*, 2013 WL 269083, at *3 (N.D. Cal. Jan. 24, 2013) ("If defendant's ERISA defense and preemption argument were accepted, it could establish a complete bar to recovery. This uncertainty, as well as the high amount of recovery, weighs in favor of approval.").

### 2.    The Parties dispute the measure and amount of damages.

In addition to liability, the Parties also dispute damages. As this Court recognized, "there is a real risk that the plaintiffs would not be able to demonstrate that they are entitled to any damages as the 'price premium' calculation would be heavily contested." PA Order ¶ 5 (language added by the Court). Both parties retained damages experts, who produced sharply different views of the value of Plaintiffs' case, even assuming liability were established. Plaintiffs' expert, Dr. D.C. Sharp's, hedonic-regression analysis concluded that consumers had paid a 31% price premium.[33] Sharp Expert Report ¶¶ 4-5, 28-31. Monsanto, however, disputes Dr. Sharp's methodology and, based on its own expert's work, contends there is no statistically significant price premium associated with the absence of warning language about a potential risk of cancer on Roundup® product labels. Rosenthal MPA Decl. Ex. A at ¶ 11. This dispute underscores the "uncertainty of outcome in litigation" that makes the settlement appropriate. *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Continued litigation would necessarily mean additional expenditure and uncertainty in resolving the proper

---

[33] The *Tomlinson* Plaintiffs have previously argued that this report should be disregarded because it focused on Florida purchasers. Dkt. No. 91 at 5. However, the methodology employed by Dr. Sharp, while based on sales data from Florida for the most common Roundup® consumer product, Roundup® Weed & Grass Killer III Ready-to-Use, was based upon the same underlying theory asserted in this litigation—it estimated the price impact of failing to disclose Roundup®'s health risks. Dkt. No. 94-1 (Wade MPA Decl.), Ex. 2 ("Sharp Report") ¶¶ 12-13. The suggestion that Dr. Sharp's report could not provide Plaintiffs with a principled basis to estimate potential damages is thus baseless.

calculation of damages, including the risk that Monsanto's damages estimate would prevail—resulting in a small or nonexistent recovery.

### 3.    Plaintiffs recognize that certification of a litigation class is uncertain.

Finally, Plaintiffs recognize that they face risks to obtaining and maintaining class certification through trial. Monsanto would argue Plaintiffs' proposed class cannot be certified because (among other arguments) it contains many individuals whose claims are not subject to the DCFA or Delaware warranty law. *See* Dkt. No. 16 at 24-26. While Plaintiffs disagree with this argument, they acknowledge that courts in the Ninth Circuit have declined to certify nationwide classes on the ground that choice-of-law principles require the court to apply the law of the state where each class member's purchases were made. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). Additionally, many states' consumer-fraud laws require proof of elements such as reliance or causation that can present serious obstacles to class certification. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011). There are thus serious risks to seeking to certify (and maintain) a litigation class in *any forum*.

### 4.    Continued litigation would be time-consuming and expensive.

This risk of costly, complex, and time-consuming litigation also weighs in favor of approval. *See Atkinson*, 2021 WL 6028374, at *1 (Chhabria, J.) (Approving the Settlement eliminates all time, burden, and expense associated with further litigation efforts[,which] weighs in favor of granting final approval."). The costs of continued litigation would also be significant. Wade Decl. ¶ 17. Although Plaintiffs and Class Counsel have confidence in their claims, a favorable outcome is not assured. *Id*. For over two years and across more than a dozen Related Actions, Monsanto has raised multiple legal and factual defenses that, barring a settlement, will require additional discovery, depositions, briefing, and other costly and time-consuming pretrial efforts. *Id*. Moving to trial would involve significant additional expert discovery and motion practice, implicating a decades-long scientific and regulatory record spanning hundreds of studies and millions of pages. *Id*. There would likely be a vigorous dispute over class certification and potentially interlocutory appeals. *Id*. It is also quite clear that there would be extensive disputes

over the existence and amount of any price premium. *Id*. And, because there is every reason to believe Monsanto would continue to vigorously defend against Plaintiffs' claims, a long and costly trial on the merits, followed by appeals, could ensue. *Id*.

Even if Plaintiffs were to certify a class and prevail at a class trial, any recovery could be delayed for years by appeal, which could have further delayed and jeopardized a class recovery. *Id*. And if a class maintained its certified status through trial, any adverse judgment would bind the entire class. *Id*. Because such additional litigation would have "in the best-case scenario been expensive and time-consuming—and in the worst-case scenario, could have led Plaintiff[s] and the Class going home empty handed," this factor likewise supports final approval. *See McDonald v. CP OpCo, LLC*, No. 17-cv-04915-HSG, 2019 U.S. Dist. LEXIS 80501, at *13 (N.D. Cal. May 13, 2019).

The Settlement eliminates these risks by ensuring Settlement Class Members a recovery that is "certain and immediate, eliminating the risk that class members would be left without any recovery…at all." *Fulford v. Logitech, Inc*., 2010 U.S. Dist. LEXIS 29042, at *8 (N.D. Cal. Mar. 5, 2010).

## B. The amount of the Settlement weighs in favor of approval.

This avoidance of risk discussed above is especially persuasive where, as here, Plaintiffs recovered almost the entire amount of damages they could seek were they to proceed to and win at trial. The fairness and adequacy of the Settlement is even more evident when the strength of Plaintiffs' claims and risks of continued litigation are compared to the substantial and direct value provided to Class Members by the Settlement Agreement. The relief provided to the class should not be "assessed in a vacuum," but instead "must be considered by comparison to what the class actually gave up by settling." *Campbell*, 951 F.3d at 1123. With that said, courts are "not expected 'to convert settlement agreement hearings into trials on the merits.'" *In re Apple Inc. Device Performance Litig.*, 2021 WL 1022867, at *14 (N.D. Cal. Mar. 17, 2021) (quoting *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990)). "[A] proposed settlement may be acceptable even

though it amounts only to a fraction of the potential recovery that might be available to class members at trial." *Toolajian v. Air Methods Corp.*, 2020 WL 8674094, at *10 (N.D. Cal. Apr. 24, 2020) (citations omitted); William B. Rubenstein, *Newberg on Class Actions* § 11.58.

Here, each Authorized Claimant will receive cash payments equal to approximately 20% of the average retail price for each unit purchased. Settlement § E(1). As explained above, this amounts to roughly *two-thirds* of Plaintiffs' estimated best-case damages at trial and is well in excess of Monsanto's estimate of damages (no more than 1.5%, with even that figure lacking statistical significance). Courts routinely approve settlements that provide for payments comprising much smaller percentages of class members' best-case recoveries.[34]

The *Tomlinson* Plaintiffs have previously argued that Plaintiffs' price-premium damages estimate fails to account for the possibility of "full-refund" or "full purchase price" damages. But Plaintiffs did not plead full-refund damages or calculate potential damages under that theory because that is not the measure of damages applicable to Plaintiffs' claims. *See Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 307 (3d Cir. 2016) (explaining that measures of damages under DCFA are "benefit of the bargain" or "out of pocket" damages, in which damages are the difference between either represented value or price paid and actual value of product); *Scoy v.*

---

[34] *See, e.g., Ferrell v. Buckingham Prop. Mgmt.*, 2020 WL 291042, at *19 n.20 (E.D. Cal. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 4364647 (E.D. Cal. July 30, 2020) (collecting cases approving settlements in which payments comprised between 0.75 and 16% of total estimated liability); *In re Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1042 (N.D. Cal. 2008) (approving settlement with payments of roughly 6% of potential damages); *see also Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 83 (1st Cir. 2015) (finding payment of less than 9% of retail price fair and reasonable); *In re Lumber Liquidators Mktg. Sales Pracs. Litig.*, No. 1:15-md-2627 (AJT/TRJ), 2018 WL 11203065, at *2 (E.D. Va. Oct. 9, 2018) (approving settlement with cash payments of "approximately 5.5 percent of the[] purchase price"); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 992 (N.D. Ohio 2016) (approving settlement in which "claimants will ultimately receive less than 20% (maybe less than 10%) of their claim value"); *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 647 n.20 (E.D. Pa. 2015) (approving settlement with payments of approximately 6% of purchase price); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2015 WL 4528880, at *7 (E.D. La. July 27, 2015) (approving settlement providing "up to the alleged 4.97 percent overcharge" on eligible purchases); *Broomfield v. Craft Brew All., Inc.*, 2020 WL 1972505, at *9 (N.D. Cal. Feb. 5, 2020) (approving settlement where relief equaled "a 12.7% price premium per-product").

*Kasal*, 1999 WL 463552, at *5 (Del. Super. Ct. Apr. 9, 1999) (similar for breach of warranty). The same is true for most other states' consumer-fraud laws and warranty statutes (including Missouri's), which likewise recognize a benefit-of-the-bargain measure, under which damages could only amount to a full refund if the product was worthless.[35] *See* Dee Pridgen et al., Consumer Protection and the Law § 6:4 (2021-2021) (describing typical consumer-fraud damages measure as "the difference between the value of the item as represented and what the item purchased was actually worth"); 67A Am. Jur. 2d Sales § 1104 (Aug. 2021 Update) (similar "difference in value" measure for breach of warranty).

For similar reasons, another district court has rejected the argument that another Roundup® Lawn & Garden class settlement should have accounted for full-refund damages. *Jones*, 2021 WL 2426126, at *6 & n.10 (noting that "class members' recovery was never going to be 100% of the purchase price" and that "full refunds would constitute a windfall"). The same reasoning applies here. Neither Missouri Class Members nor Class Members from other states could reasonably expect to recover damages equal to 100% of the purchase price. The Settlement's failure to provide for such damages is not unreasonable.

Nor is there any merit to the *Tomlinson* Plaintiffs' argument in previous briefing that the Settlement should include provision for punitive damages they seek in Missouri.[36] Even if there were a meaningful likelihood of punitive damages in a consumer class-action with no claim of personal injury (and Class Counsel does not believe there is), a nationwide settlement need not

---

[35] *See Kerr v. Vatterott Educ. Ctrs. Inc.*, 439 S.W.3d 802, 814 (Mo. Ct. App. 2014) (holding "refund" damages are available only when plaintiff "rescinds and returns the property received or whe[n] he received nothing of value"); *see also In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) ("[T]he Full Refund model depends upon the assumption that not a single consumer received a single benefit…."). It would be extraordinarily difficult to establish that the Roundup® products have *no* value. Plaintiffs do not allege, for example, that the Products were ineffective at killing weeds or otherwise did not perform their intended function.

[36] The *Tomlinson* court has not ruled on the plaintiffs' request for punitive damages. And the bar for punitive damages under the MMPA is high. *See Walsh v. Al W. Chrysler, Inc.*, 211 S.W.3d 673, 676 (Mo. Ct. App. 2007).

account for the speculative possibility that a fraction of class members could potentially recover punitive damages under certain states' laws. *See Moore v. Verizon Comms. Inc.*, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013) (a settlement need not provide for punitive damages and such awards are "inherently speculative and discretionary"); *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *12 (N.D. Cal. Mar. 24, 2017) ("[Objector's] ancillary contention that Plaintiffs should have taken into account Defendants' potential exposure to punitive damages has likewise been rejected by this Circuit."). Moreover, "[i]t is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages—that is why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately." *Lane v. Facebook, Inc.*, 696 F.3d 811, 825 (9th Cir. 2012). In any event, this Court has already held that the "settlement amount and [20 percent] compensation amounts appear to be adequate given the many risks inherent in this litigation." PA Order ¶ 5.

At the preliminary-approval hearing and in the preliminary-approval order, the Court noted that it would be concerned with the adequacy of the settlement amount if it turned out that claims rates were so high that a substantial downward adjustment to claims payments was required. *Id.* ¶ 4 ("[I]f the participation rate ends up being significantly greater than contemplated by the agreement (such that the ceiling is exceeded by a substantial margin), the Court could reject the settlement at the final approval stage."); Transcript of hearing on Plaintiffs' Motion for Preliminary Approval ("Hearing Tr.") at 14 ("So what if enough people submit claims that even if they were only recovering the minimum amount they could recover without submitting proof of purchase and all that … using that minimum amount would call for a payment of $300 [million]? … wouldn't that be evidence in the record at final approval that the settlement was unreasonable?").

The Court's concern has not come to fruition. As explained above, given the anticipated claims rate of 2.33 to 2.67 percent, the Ceiling will not be exceeded and Class Members will receive the 20 percent payments contemplated by the Settlement with no downward adjustment,

let alone a "substantial" adjustment. In sum, claimants will receive precisely the payments that this Court already determined were adequate at the preliminary-approval stage.

Further, the claims rate in this case is consistent with claims rates regularly seen in similar consumer class actions and the claims rate predicted at preliminary approval. *See* Dkt. No. 94-4 ¶ 11 (estimating a likely claims rate in this case between 1 to 5 percent). It is consistent, for example, with the claims rate in another recent class-action settlement related to Roundup®. *Jones v. Monsanto Co.*, 2021 WL 2426126, at *3 (W.D. Mo. May 12, 2021), aff'd, 38 F.4th 693 (8th Cir. 2022) (claims rate of 2-3%). It is also consistent with claims rates in numerous other consumer settlements approved in this Circuit. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9ᵗʰ Cir. 2015) (affirming approval of settlement with claims rate of less than 3.4%); *Rael v. Children's Place, Inc.*, No.: 3:16-cv-00370-GPC-LL, 2020 WL 434482, at *9 (S.D. Cal. Jan. 28, 2020) ("[C]onsumer class actions tend to result in claims rates in the low single digits."). And it is consistent with this Court's own statement that "low participation rate[s]" are to be expected in such consumer settlements.

A district court's role is "to ensure the settlement is 'fundamentally fair within the meaning of Rule 23(e).'" *TracFone*, 112 F. Supp. 3d at 1004-05 (quoting *Lane*, 696 F.3d at 819). This Settlement is fundamentally fair.

## C.    The extent of discovery and stage of proceedings weigh in favor of approval.

"[I]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted). Courts instead "look for indications 'the parties carefully investigated the claims before reaching a resolution.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2016 WL 6248426, at *13 (N.D. Cal. Oct. 25, 2016), *aff'd* 895 F.3d 597 (9th Cir. 2018), *and* 741 F. App'x 367 (9th Cir. 2018) (quoting *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014)) (holding that factor weighed in favor of approval where parties

settled in early stages of litigation prior to "dispositive motion practice," but plaintiffs had served written discovery, "analyzed economic damages (and retained experts concerning those issues)," and done "careful investigation of their claims before they filed their Complaint").

Class Counsel aggressively litigated the claims released by the Settlement here for more than two years across more than a dozen Related Actions. The Parties engaged in formal discovery in the related *Ezcurra* and *Weeks* matters and informal discovery before mediation. That includes Plaintiffs' preparation of an expert report, responses to dozens of interrogatories, and Monsanto's production of thousands of pages of documents. Class Counsel also conducted a "careful investigation of their claims" prior to filing suit, including reviewing extensive information and documentation from the personal-injury litigation and the regulatory record that is available online.[37] The Settlement Agreement was reached only after dispositive motion practice in this and Related Actions. Thus, Class Counsel were well versed in the strengths and weaknesses of Plaintiffs' claims, when the Settlement Agreement was negotiated. *See also Palacios v. Penny Newman Grain, Inc.*, 2015 WL 4078135, at *8 (E.D. Cal. July 6, 2015) ("The information defendants provided allowed plaintiffs to conduct other investigations and to conclude that the settlement amount is 'extremely favorable'"); *Atkinson*., 2021 WL 6028374, at *2 (Chhabria, J.) ("At the time the Settlement was signed, this litigation had been pending for nearly a year. During settlement negotiations, the parties exchanged relevant discovery necessary to make an informed decision regarding settlement.").

## D.    The experience and views of counsel weigh in favor of settlement.

Parties represented by competent counsel are well positioned "to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967 (quoting

---

[37]    *See* Baum Hedlund, *Monsanto Papers*, https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/monsanto-secret-documents/ (last visited October 20, 2021); *see also* Environmental Protection Agency, *Glyphosate Registration Review Docket*, https://www.regulations.gov/docket/EPA-HQ-OPP-2009-0361 (last visited October 20, 2021).

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.1995)) (internal quotation marks omitted). Courts thus "afford 'great weight to the recommendation of counsel.'" *Volkswagen*, 2016 WL 6248426, at *14 (citation omitted).

Class Counsel have significant experience with consumer class actions and other complex litigation, including being appointed as lead or co-lead class counsel in several cases in this Court and other state and federal courts and to plaintiffs' executive committees in several multidistrict class-action litigations. Wade MPA Decl. ¶¶ 22, 25-34; Oster MPA Decl. ¶¶ 10-13. The Settlement was reached only after hard-fought, arms' length negotiations between competent and well-informed counsel that were facilitated by an experienced mediator. Wade MPA Decl. ¶¶ 15, 35-36; Oster MPA Decl. ¶¶ 14-15. For all the reasons expressed herein, Class Counsel believe the Settlement constitutes an excellent recovery for Class Members and is fair, reasonable, and adequate. Wade MPA Decl. ¶¶ 35-36; Oster MPA Decl. ¶¶ 14-15. This factor thus weighs in favor of approval. *See Atkinson*, 2021 WL 6028374, at *2 (Chhabria, J.) ("The Settlement was negotiated by highly skilled and experienced cybersecurity and class action lawyers[, and] [c]ounsel for both parties considered the numerous legal issues the case presented, as well as the relative strengths and weaknesses of the litigation. These competent lawyers endorse the Settlement, and the Court finds that this factor supports final approval.").

## E.    The lack of a governmental participant at this stage is neutral.

In accordance with Class Action Fairness Act, 28 U.S.C. §§1715, *et seq*., the Claims Administrator caused notice of the Settlement to be sent to the Attorneys General of all states and territories as well as the Attorney General of the United States. Schwartz Decl. ¶ 5. To date, no government agency has objected to the Settlement.[38] *Id.* ¶ 6. "There is no governmental participant in this Class Action. As a result, this factor does not apply to the Court's analysis." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (granting

---

[38] By pointing out that no government entity has objected to the Settlement, Plaintiffs in no way suggest that the Settlement enjoys the support of any government entity. Additionally, another week remains for objections to be lodged against the Settlement.

final approval); *Atkinson*, 2021 WL 6028374, at *2 (Chhabria, J.) ("The Court notes that there have been no objections to the Settlement and no concerns raised by any government entity.").

## F.    The reaction of the Class Members to the Settlement favors final approval.

Notice was given and the claims period has expired with at least 226,268 valid claims and possibly as many as 230,097. There were only seven opt-outs (five represented by the same counsel) and with only a week remaining before the deadline, there have been no objections beyond those already considered and rejected at the preliminary approval stage. The Objectors to preliminary approval did not opt-out. In short, the reception to the proposed settlement has been overwhelmingly positive. *See Atkinson*, 2021 WL 6028374, at *1 (Chhabria, J.) ("Out of 4,198,490 Class Members notified of the Settlement, none objected to the Settlement, and only 12 requested to be excluded from the Settlement. This demonstrates that Class Members support the Settlement and attests to its fairness.") (citing *Custom LED, LLC v. eBay, Inc.*, 2014 WL 2916871, at *5 (N.D. Cal. June 24, 2014) (a .04% opt-out rate with one objection is an "overwhelmingly positive reaction" from class members)).

## G.    Other Rule 23(e) Factors

### 1.    The methods for processing claims and distributing monetary relief are effective and adequate.

As explained by the 2018 Advisory Committee Notes to Rule 23, a "claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." The proposed method of processing claims here strikes that delicate balance. Class Members who are seeking monetary relief under the Settlement need only submit a relatively simple claim form online. The short and simple Claim Form only required Class Members to provide their contact information and basic information about their purchases of the Products (e.g. number of Products purchased, when they were purchased, and in which state). Schwartz Decl. ¶ 30. Proof of purchase was not required, except for the three largest Roundup Products. *Id*. Class Members had the option of making claims online or by sending the printed Claim Form to the Settlement Administrator. *Id.*

Payments to Class Members who submitted valid Claim Forms will be disbursed directly to eligible claimants. *Id*. Class Members who submitted claims via the online Claim Form portal on the Settlement Website had options for receiving payments via check or electronically, such as by PayPal, with the vast majority selecting electronic payment. *Id.*

Both the claims process and method for distributing the monetary portion of the settlement are claimant-friendly, efficient, and support final approval.

### 2.    The terms of the proposed award of attorneys' fees are fair.

The Settlement provides that Monsanto will not object to Class Counsel applying for an award of attorneys' fees of up to 25% of the Ceiling Amount (or up to $11,250,000). Settlement § F(1). The settlement also provides that Class Counsel's litigation expenses, if approved by the Court, will also be paid by Monsanto. *Id*. As detailed in Plaintiffs' Motion for Attorneys' fees, Costs, and Incentive Awards, filed on October 31, 2022, the amount of the requested proposed attorneys' fees and litigation expenses is fair and reasonable. Dkt. 122.

The timing for payment of the Fee and Expense Award under the Agreement, if approved, is fair and reasonable. Specifically, such fees, costs, and expenses, if approved by the Court, will be paid within twenty-one days following the Effective Date (subject to this Court's holdback of a percentage of any such award pending a final claims review), which under no circumstances will be prior to the Settlement Approval order and Final Judgment. *Id*. § F(3). Accordingly. Class Counsel will only get paid if the Settlement is finalized, which is fair to the Settlement Class. *Id*.

### 3.    There are no Rule 23(e)(3) supplemental agreements to identify.

Rule 23(e) requires that the parties identify "any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). Here, there are no "side-agreements" made in connection with the Settlement. Wade MPA Decl. ¶ 44.

### 4.    Class Members are treated equitably relative to each other.

The 2018 Advisory Committee Notes to Rule 23 explain that this factor concerns "inequitable treatment of some class members vis-à-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences

among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.* None of those concerns are present here.

Here, each Class Member is treated in the same manner with respect to the claims they are releasing and their eligibility for a monetary award. Each member of the Class is treated in the same manner with respect to the claims they are releasing and their eligibility for an award. Under the Agreement, each Settlement Class Member can submit a claim for approximately 20% of the purchase price of the Products purchased, regardless of the amount actually paid and without providing any proof of purchase (except for the three largest Products, for which proof of purchase required). Settlement §§ E(1), I(6). Additionally, each Class Member is able to make claims for purchases made within the statute of limitations for the state in which the Products were purchased. *Id*. § I(6). Claims may increase or decrease *pro rata*, which will ensure all Settlement Class Members are treated equally if the total settlement amount falls short of the Settlement Floor or surpasses the Ceiling Amount (it will not). *Id*., §§ E(2)-(3). Overall, this approach provides claimants the ability to obtain a payment commensurate with their potential losses, as compared to other Class Members. This structure is fully in line with the 2018 Committee Notes' directive to "deter or defeat unjustified claims" without being "unduly demanding."

The Settlement, which allows Plaintiffs to apply for service awards of up to $5,000 each, does not improperly grant them preferential treatment. Rather, it is an appropriate amount to compensate them for their time and dedication to the case, as well as for the risks they undertook in bringing this Action. *See, eg.,* ECF Nos. 122-9, 122-10, 122-11, 122-12, 122-13, 122-14, 122-15, 122-16; *see also Ahmed v. HSBC Bank USA,* No. ED CV 15-2057 FMO (SPx), 2019 U.S. Dist. LEXIS 104401, *34 (C.D. Cal. Jun. 21, 2019) (finding $5,000 incentive award "presumptively reasonable") (citing *In re Online DVD-Rental,* 779 F.3d 934, 947-48 (9th Cir. 2015) (upholding $5,000 incentive awards).

## II.    THE SETTLEMENT CLASS SHOULD REMAIN CERTIFIED

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the settlement class satisfies Fed. R. Civ. P. Rule 23(a) and (b). *Hanlon v. Chrysler Corp*.,

150 F.3d 1011, 1022 (9th Cir. 1998). The Court found that the proposed Settlement Class satisfies the prerequisites for a class action under Fed. R. Civ. P. Rule 23(a) and (b)(3). PA Order ¶¶8-9. No facts that would affect these requirements have changed since the Court preliminarily approved the Settlement in June 2022, and this motion incorporates by reference the prior analysis as set forth in the Motion for Preliminary Approval and the Preliminary Approval Order. *See* PA Order and Dkt. Nos. 94, 105-110. Accordingly, this Court need not revisit class certification here, and the Class should remain certified for settlement. *See In re Lenovo Adware Litig*., NO. 15-md-0264-HSG, 2019 U.S. Dist. LEXIS 69797, *20 (N.D. Cal. April 24, 2010).

## **CONCLUSION**

Based on the foregoing, the proposed Settlement is fair, adequate, and reasonable. With the consent of Defendant Monsanto, Plaintiffs therefore respectfully request that the Court: (1) grant final approval of the Settlement; (2) finally certify the Settlement Class; (3) order Monsanto to comply with the relief described in the Agreement; (4) authorize P&N to administer the settlement benefits to the Settlement Class Members who submitted valid claims; (5) authorize the entry of a final judgment of the Action with prejudice following the requisite post-distribution accounting as required by this Court and the Local Rules; and, (6) grant Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards (Dkt. No. 122).

Dated: November 28, 2022                    */s/ Gillian L. Wade*

GILLIAN L. WADE
SARA D. AVILA
MARC A. CASTANEDA
Milstein, Jackson, Fairchild & Wade, LLP
gwade@mjfwlaw.com
savila@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
The Law Offices of Howard Rubinstein
joel@joelosterlaw.com

39

22052 W. 66th St. #192
Shawnee, Kansas 66226

*Counsel for Plaintiffs and the Settlement Class*